STATE EX REL. EAST BRIAR, INC., Petitioner-Respondent,

v.

The BOARD OF REVIEW OF the TOWN OF ROME, Appellant.†

Court of Appeals

*No. 82–1319. Submitted on briefs February 21, 1983.—*
*Decided April 18, 1983.*
(Also reported in 334 N.W.2d 692.)

† Petition to review denied.

34

*Affirmed.*

For the appellant the cause was submitted on the briefs of *Terwilliger, Wakeen, Piehler, Conway & Klingberg, S.C.,* of Stevens Point.

For the petitioner-respondent the cause was submitted on the brief of *Chambers, Nash, Pierce & Podvin, S.C.,* of Wisconsin Rapids.

Before Gartzke, P.J., Dykman, J. and W.L. Jackman, Reserve Judge.

DYKMAN, J.   The Board of Review of the Town of Rome appeals from an order remanding this case to the board to reconsider the 1981 tax assessments on real property owned by East Briar, Inc.  The issues are whether the assessor followed statutory requirements in assessing East Briar's dam, artificial lake and golf course, and whether she considered the time and expense necessary to sell lots in a subdivision.  We conclude that the assessor erred in both respects and therefore affirm the trial court's order.

East Briar, Inc., owns a real estate development called "Lake Arrowhead", located near Wisconsin Dells. It consists of 3,581 acres, including several subdivisions and recreational amenities such as a lake, dam, golf course, clubhouse, swimming beaches, beach center buildings, park forest, ski chalet, ski hill and tennis courts. The development is in various stages of construction with lots for sale in several subdivisions. The artificial lake, dam and golf course are substantially completed.

East Briar objected to the town's property tax assessment and a hearing was held before the town board of review on August 17, 1981. East Briar and the town assessor presented extensive evidence concerning valuation and assessment.

After the board upheld the assessments, East Briar appealed by certiorari to the circuit court. The trial court remanded the matter to the board because the real estate amenities were not assessed at the amount obtainable at a private sale and because the assessor failed to consider marketing expense in connection with selling the subdivision lots.

We stated the scope of judicial review of tax assessments in *State ex rel. Wis. Edison Corp. v. Robertson,* 99 Wis. 2d 561, 565–66, 299 N.W.2d 626, 628–29 (Ct. App. 1980):

" 'The principles of law are well settled governing the jurisdiction of courts in reviewing the findings of boards of review on *certiorari.* The duties of boards of review are *quasi*-judicial and courts have no jurisdiction to disturb their findings or determinations except where they act in bad faith or exceed their jurisdiction. Judicial review of the action of boards of review on *certiorari* extends only to jurisdictional errors. If a board of review does not act arbitrarily or dishonestly and the evidence presented before it is sufficient to furnish any substantial basis for the valuation found by the board,

its decision will not be disturbed. The review here extends only to correction of jurisdictional errors and does not include mere errors of judgment as to the preponderance of the evidence. Upon *certiorari* to a nonjudicial body such as a board of review, the court will review the evidence only so far as to ascertain if there is reasonable ground for belief that the decision is the result of honest judgment, in which case it will not be disturbed. This court will review the proceedings to ascertain whether such body has kept within its jurisdiction and whether such board acted upon competent evidence sufficient to give it jurisdiction. The presumptions are all in favor of the rightful action of such board. The assessor's valuation of property is *prima facie* correct and is binding upon the board of review in the absence of evidence showing it to be incorrect.' [Quoting *State ex rel. Pierce v. Jodon,* 182 Wis. 645, 647–48, 197 N.W. 189, 190 (1924).]

"In addition, failure to make the assessment on the statutory basis is an error of law and correctable by the courts on certiorari. If the trial court finds upon the undisputed evidence before the board that the assessment has not been fixed upon the statutory basis, the assessment should be set aside. (Citations omitted.)"

## ASSESSMENT OF AMENITIES

Section 70.32(1), Stats., provides in pertinent part:

Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practically obtain, at the full value which could ordinarily be obtained therefor at private sale. . . .

This statute has been consistently construed to mean that real property must be assessed on the basis of its fair market value. *Rosen v. Milwaukee,* 72 Wis. 2d 653, 661, 242 N.W.2d 681, 684 (1976). Fair market value of land is the "amount it will sell for upon negotiations

in the open market between an owner willing but not obliged to sell and a buyer willing but not obliged to buy." *Id.* (footnote omitted).

The best information of fair market value is a sale of the property or sales of comparable properties if no such sale has occurred. *Wis. Edison Corp.*, 99 Wis. 2d at 567, 299 N.W.2d at 629. Some property, however, is not subject to assessment in the manner outlined above.

"For property whose market is restricted or nonexistent and for unique property which is not for sale the appraisal is necessarily based on many factors other than actual sales of this or comparable property. Nevertheless, the task of the appraiser is to determine, as accurately as he can, the amount which the property would bring in the period for which the assessment is made, both buyer and seller being willing and able to deal. . . ." [Citation omitted.]

*State ex rel. Mitchell Aero v. Bd. of Review,* 74 Wis. 2d 268, 277–78, 246 N.W.2d 521, 526 (1976).

In such a case, fair market value is obtained by considering all relevant factors which have a bearing on that value, including cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner. *Id.* at 278, 246 N.W. 2d at 526. "In the absence of actual sale, or sale of reasonably comparable property, all of the above factors which are ascertainable and which collectively have a bearing on the value of the property must be considered by the assessor in order to determine its fair market value." *Id.*

The trial court remanded becauses the assessor had not considered the effect of "restrictions" on the sale

of the amenities which affect their value.[1]  Restrictions on the sale of the amenities exist.  Each member of Lake Arrowhead Association, Inc. has a fractional interest in the amenities.  East Briar is required to convey the amenities to the association within six months of sale of all tracts in the development.  These restrictions reduce the value of the amenities because a buyer would have to be willing to purchase them with their restrictions as to sale and use.  These restrictions therefore reduce the amenities' value below the value they would have were the restrictions not in existence.

The amenities have some value, however.  East Briar retains the right to open the amenities to the public and charge user fees.  It could retain one or two lots and avoid conveyance of the amenities indefinitely.  In addition, it may apply the restrictions to other, noncontiguous land and thereby continually increase the development and never convey the amenities.  The value of amenities must be determined by the assessor for tax purposes.[2]

---

[1] The parties use the term "restrictions."  This term could be misinterpreted because real estate "restrictions" usually mean limitations on the use of real estate.  Here, the restrictions are more analogous to easements.  East Briar has given each owner of a lot in a subdivision a right to use the golf course, lake, dam and other amenities.  It has also given that right to "certificate holders," who do not own lots in the subdivisions.  Both classes are "members" of the Lake Arrowhead Association, Inc.  A sale of the amenities would be subject to the rights of the members because the rights are of record.

[2] East Briar argued at the Board hearing that the fair market value of each lot should be reduced by approximately $1,066 per lot, which represents the cost of constructing the remaining amenities divided by 2,050, the expected number of lots.  The amenities increase the value of the lots due to their location in relation to the amenities, and the rights the lot owners have to use the amenities.  Although the cost of completing the amenities is reflected in the price of the lots, the completion cost does not reduce the fair market value of the lots.  The assessor properly refused to reduce the fair market value of each lot by $1,066.

The only testimony by the assessor concerning her assessment of the amenities related to the golf course. She stated that she arrived at its value strictly according to costs of construction. She compared the golf course to other courses in the area. She acknowledged that this course was a championship course and the other courses were not. She was not aware that there were restrictions on the sale and use of East Briar's golf course and that no golf course she used as a comparable had restrictions similar to those in this case.

■

The assessor must consider the restrictions on East Briar's amenities because they have a bearing on the value of the amenities. It was error for the board to sustain the assessments. The trial court correctly remanded the matter back to the board for reconsideration.

## TIME AND EXPENSE TO MARKET

■

The trial court determined that the assessor did not consider the time and expense necessary to market the lots, contrary to sec. 70.325, Stats., which requires her to do so. We agree with the trial court's determination.

Section 70.325, Stats., provides: "In determining the market value of lots in a recorded subdivision, the assessor shall take into consideration the time and expense necessary to market the lots." The 1955 Legislative Council Report, Vol. IV: Subdivision and Platting of Land states that the statute was intended to alleviate some of the tax burden on the subdivider which results from the increased value of the land after platting.[3] *Id.* at 22.

---

[3] Hack and Sullivan discuss sec. 70.325, Stats., in their article "Taxation of Undeveloped Real Property in Wisconsin," 47 Wis. Bar Bull. 37, 38 (1974).

East Briar presented evidence that fifteen years is needed to sell all the lots in the development and that it required a thirty percent rate of return on its investment. The assessor used a sellout period of two to five years, depending on actual sales in each particular subdivision, and an eighteen percent rate of return. East Briar argued to the board that the assessor did not consider its contractual forty-five percent broker's commission on the sale of all lots. The assessor challenged the forty-five percent commission but admitted she did not know that East Briar paid this commission on all lots sold, and therefore had not considered this marketing expense in determining the lots' market value.

To determine the value of the lots, the assessor used the following formula contained in the Property Assessment Manual for Wisconsin Assessors, Vol. 1, Part 1, page 8–12:

Total market value of unsold developed lots[4]

— total raw land value of unsold lots
× factor for that year of the projection term (found in Figure 8–6)[5]

---

[4] Neither party has raised the issue of whether the assessor properly arrived at the market value of each lot by averaging the prices of all lots.

[5] Figures 8–5 and 8–6 are found at pages 8–12 and 8–13 of the Wisconsin Assessors Manual. Figure 8–5 is a present value table using a one- to five-year sellout period and a ten to eighteen percent rate of return using single interest. Figure 8–6 takes the present value numbers found in Figure 8–5 and develops the factors for a five-year projection term in the manner shown directly under Figure 8–5.

It appears that Figure 8–5 contains an error in the formula for the fourth year factor used in the table "Development of Factors for a Five Year Projection Term." The formula should not include the number .6771, but should read $(.8777 + .7706)/2 = .8242$ or .82.

**Figure 8-5**

Rate of Return on Investment

| Year | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% | 18% | Total | Total Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | .9091 | .9009 | .8929 | .8850 | .8772 | .8696 | .8621 | .8547 | .8475 | 7.899 | .8777 |
| 2 | .8264 | .8116 | .7972 | .7831 | .7695 | .7561 | .7432 | .7305 | .7182 | 6.9358 | .7706 |
| 3 | .7513 | .7312 | .7118 | .6931 | 6750 | .6575 | .6407 | .6244 | .6086 | 6.0936 | .6771 |
| 4 | .6830 | .6587 | .6355 | .6133 | .5921 | .5718 | .5523 | .5337 | .5158 | 5.3562 | .5951 |
| 5 | .6209 | .5935 | .5674 | .5428 | .5194 | .4972 | .4761 | .4561 | .4371 | 4.7105 | .5234 |

Development of Factors for a Five Year Projection Term

1st year factor $\dfrac{.8777 + .7706 + .6771 + .5951 + 5234}{5} = .6888$ or .69

2nd year factor $\dfrac{.8777 + .7706 + .6771 + .5951}{4} = .7301$ or .73

3rd year factor $\dfrac{.8777 + .7706 + .6771}{3} = .7751$ or .78

4th year factor $\dfrac{.8777 + 7706 + .6771}{2}$ [sic] $= .8242$ or .82

5th year factor $\dfrac{.8777}{1} = .8777$ or .88

Development of Factors for a Three Year Projection Term

1st year factor $\dfrac{.8777 + .7706 + .6771}{3} = .7751$ or .78

2nd year factor $\dfrac{.8777 + .7706}{2} = .8242$ or .82

3rd year factor $\dfrac{.8777}{1} = .8777$ or .88

**Figure 8-6**

Projection Term

| Year | One Year | Two Years | Three Years | Four Years | Five Years |
|---|---|---|---|---|---|
| 1 | .88 | .82 | .78 | .73 | .69 |
| 2 | | .88 | .82 | .78 | .73 |
| 3 | | | .88 | .82 | .78 |
| 4 | | | | .88 | .82 |
| 5 | | | | | .88 |

$\div$ number of unsold lots
$+$ raw land value per unsold lot
$=$ value of each lot
$\times$ assessment level
$=$ assessed value of each lot in the subdivision.

The factor for the year of the projection term is obtained by determining the present value of the sale price of each lot for each year of the sellout period at a given rate of return.[6] The conflict in the instant case arises over the sellout period and the rate of return used by the assessor. There is also a conflict whether the brokerage commission should be deducted at some point in the formula. The formula as stated is not challenged on appeal.

*Rate of Return*

The assessor used an eighteen percent rate of return. That is the highest rate used in the assessor's manual.[7] She gave no reason for choosing that rate of return, and presented no evidence to the board regarding the required rates of return.

East Briar's undisputed evidence showed that the Lake Arrowhead development had a required rate of return of thirty percent. Most of the testimony, however, does not specify whether the thirty percent rate of return was the per annum rate of return or the projected rate of return over the life of the development. To determine the factor for the year of the projection term, it is necessary to ascertain the per annum rate of return. East

---

The last two columns of Figure 8–5, titled "Total" and "Total Average," have no practical use for Wisconsin assessors. The development of factors shown under Figure 8–5 uses the figures contained in the "Total Average" column. An assessor would never use these average numbers because he or she must determine a specific rate of return before developing the factors for the projection term. The last two columns are therefore confusing and useless.

[6] *See* note 5, *supra.*

[7] *See* note 5, *supra.*

Briar's evidence was to the effect that most land developments have rates of return varying from thirty to forty percent and that the general rule of thumb for land development projects is one-third for land and development costs, one-third for marketing and one-third for profit. On cross-examination, an officer of East Briar testified that a rate of return of thirty to forty percent was required to induce a developer to enter a project as large as Lake Arrowhead because of the inherent risk involved. This evidence is inconclusive concerning whether the required rate of return is the per annum rate required by the formula.

East Briar's exhibits show that it is referring to a thirty percent per annum rate of return. Both exhibits 1 and 2 prepared by East Briar's appraiser present his application of the assessor's manual formula using a thirty percent rate of return. It is necessary to use a per annum rate of return to use this formula. Therefore, East Briar did present undisputed evidence to the board that its required rate of return was thirty percent per annum.

The board may not disregard unimpeached, uncontradicted evidence which shows that the assessor's valuation is incorrect. *Rosen,* 72 Wis. 2d at 662, 242 N.W.2d at 684–85. The board erred by affirming the assessments because it disregarded the undisputed evidence that the rate of return required by East Briar was thirty percent per annum and the assessor had no reason for using an eighteen percent per annum rate of return.

*Sellout Period*

The assessor used a sellout period of two to five years for each subdivision within the development. She computed the sellout period by dividing the total number of lots in a subdivision by the number of lots sold dur-

ing the first year. For example, if a subdivision contained 200 lots and fifty lots were sold in the first year, the sellout period would be four years.

East Briar had the burden of producing evidence to overcome the presumption that the assessor made the correct valuation. *Rosen*, 72 Wis. 2d at 661–62, 242 N.W. 2d at 684. East Briar's appraiser testified that he used a fifteen year sellout period to sell the entire development, not each individual subdivision. He also testified that a subdivision's greatest sales were in the first year and that future sales could not be anticipated at this same rate. He said that another subdivision in the Town of Rome had 200 unsold lots after ten years of sales.

The assessor used the only mathematically definitive formula either party considered to obtain the sellout period. We accept the assessor's method of estimating the sellout period.[8] The assessor could not be expected to utilize a speculative sellout period based on subdivisions in other developments. The assessor's manual states that the sellout period must be reconsidered each year as sales increase or decrease. Vol. 1, part 1, p. 8–15. The assessor will alter future assessments as future sales establish a more accurate prediction of the actual sellout period. The board did not err in affirming that portion of the assessments.

[8] However, using the assessor's method, the assessment for the "Kingswood" subdivision is incorrect. East Briar owned 203 lots in that subdivision on January 1, 1980 and owned 170 lots on January 1, 1981. Thus, it sold 33 lots in the first year of sales. The assessor used a four year sellout period for the remaining 170 lots. However, 33 lots sold each year for four years equals 132 lots sold, not the 170 remaining. The sellout period for this subdivision must be recalculated.

*Brokerage Commission*

Section 70.325, Stats., requires that the assessor take into account the expense necessary to market the lots in making property assessments for recorded subdivision lots. East Briar claims that the assessor did not reduce the assessments of their subdivision properties by the contractual forty-five percent commission with their broker. The undisputed evidence is that East Briar pays a forty-five percent commission on all lands sold by a licensed real estate brokerage firm.[9]

The assessor testified that the factor for each year of the projection term in the manual's formula reduced the assessment by the marketing expense. That is incorrect. The factor simply determines the present value of the selling price for a lot, given a specific sellout period and a specific rate of return.[10] It does not reduce the assess-

---

[9] East Briar acknowledged that its forty-five percent commission was large but explained why it was necessary. The broker set up phone rooms in Milwaukee and Chicago with ten to fifteen people calling potential purchasers during the day and night and other people going to homes and soliciting contracts. Appointments are made and the potential purchasers have their gas and motel expenses paid and a salesperson accompanies them through the development. The object is to sell out the development as soon as possible.

[10] The factor for the projection term is obtained by using the present value for each lot in a given year. At page 247 of the Board of Review hearing transcript, the assessor uses the example of a factor of .7182 which results from a two-year sellout period and a rate of return of eighteen percent. She obtained the figure .7182 from Figure 8–5 in note 5 above. Figure 8–5 is simply a present value table using one to five years and ten to eighteen percent rate of return or interest. Present value is mathematically stated as $PV_n = 1/(1 + i)^n$ where "n" is the number of time periods (in this case years) and "i" is the interest rate. By using this formula, it is apparent that Figure 8–5 is a simple present value table that does not take into account the expense necessary to market the lots.

ment by the expense necessary to market the lots, as required by sec. 70.325, Stats. That reduction has yet to be made.

East Briar argues that upon remand the assessor should deduct the forty-five percent commission from the sales price before completing the formula. The commissions are expenses which will be incurred in the future as each lot is sold. The present value of the commissions must be computed just as the present value of the sales price was computed before the assessment is made.[11]

The assessor will need to make a separate computation of the present value of the commissions. The commission expense is determined by multiplying the percentage of commission by the sales price. In order to ascertain the present value of the commissions, the assessor will need to know the specific rate of return and the specific number of years until the commission will be paid.[12] The number of years will be the same as the sellout period for the subdivision in question. This will match the future expense for the commissions with the anticipated sellout rate for each subdivision.

The assessor must also determine the proper rate of return, which is not necessarily the same rate of return

---

The assessor's figure of .7182 is obtained from $PV_2 = 1/(1 + .18)^2$. This is the formula for the present value of the selling price of a lot with a two-year sellout period and a rate of return of eighteen percent. $PV_2 = 1/(1.18)(1.18) = 1./3924 = 0.7181844$ or 0.7182. This is the same number found in Figure 8–5 under a two-year sellout period at eighteen percent interest. Therefore, the assessor erred in concluding that the expense necessary to market the lots was already included in Figure 8–5. The Board erroneously affirmed her assessments when she did not make them on the statutory basis which requires a reduction for both time *and* expense necessary to market the lots.

[11] We use the term "present value of the commission" because the commission will not be paid until some time in the future. It would be unreasonable under sec. 70.325, Stats., to deduct the entire current commission expense because that expense will not arise until a lot is sold.

[12] *See* note 10, *supra*, for the present value formula.

required by the developer as a return on the real estate development.[13] The assessor must have evidence to support the rate of return chosen.

Once the selling price of each lot has been reduced to present value by working the formula contained in the assessor's manual, the computed present value of the commissions should be subtracted. This will result in the value of each lot which is multiplied by the assessment level to obtain the assessment.

The trial court correctly remanded the matter to the board of review for reconsideration of the challenged assessments.

*By the Court.*—Order affirmed, with directions to remand the matter to the board for further proceedings consistent with this opinion.

---

[13] The rate of return required to induce investment in a real estate venture depends to a great extent on risk. The rate of return on future commissions recognizes little more than that the commission is due in the future.