MONTAUP ELECTRIC COMPANY vs. BOARD OF ASSESSORS OF
WHITMAN.

Suffolk.  November 10, 1983. — January 23, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Taxation,* Personal property tax:  value, public utility.

In a proceeding to determine the fair cash value of a utility's taxable per-
    sonal property in Whitman consisting of a transformer, steel towers,
    circuit breakers, switches, and cables, substantial evidence did not
    support the Appellate Tax Board's decision to rely almost exclusively
    on the depreciated reproduction cost of the utility's personal property,
    while disregarding the rate base value, or net book cost, of the prop-
    erty.  [849-856]

APPEAL from a decision of the Appellate Tax Board.

*Robert T. Capeless* (*William M. Cloran* with him) for the
plaintiff.

*William B. Golden* (*Robert J. Cotter* with him) for the
defendant.

LIACOS, J.  Montaup Electric Company (Montaup) ap-
peals to this court pursuant to G. L. c. 58A, § 13, from the
decision of the Appellate Tax Board (board) upholding the
valuation of its personal property for the fiscal years 1979,
1980, and 1981 by the board of assessors of Whitman (asses-
sors).  We conclude that the board committed reversible er-
ror by disregarding relevant evidence of fair cash value
without a legally supportable justification.  We therefore
remand the case to the board for a redetermination of the
fair cash value of Montaup's property.

The following facts are undisputed.  Montaup is a public
utility engaged in purchasing and generating electricity,
and transmitting and selling it mainly to two affiliated com-
panies in the Brockton and Fall River areas.  Montaup is

subject to rate regulation by the Federal Energy Regulatory Commission (FERC). In the town of Whitman, Montaup owns and operates an electrical switching substation from which it distributes electricity coming from the Boston and Cape Cod areas. The major items of property in the substation consist of a transformer that steps down the voltage to the 115,000 volt service capacity, steel towers, circuit breakers, switches, and cables.

The assessors valued Montaup's personal property at $4,684,500 for the fiscal years 1979 and 1980, and $4,727,900 for the fiscal year 1981. Montaup seasonably applied to the assessors for abatement of the taxes. The assessors granted a partial abatement of the tax assessed for the fiscal year 1979, reducing the assessment from $4,684,500 to $4,567,800. Montaup filed timely appeals with the board under the formal procedure from the assessors' refusal to (1) further abate the tax assessed for the fiscal year 1979; (2) abate the tax assessed for the fiscal year 1981; and (3) act on Montaup's application for an abatement for the fiscal year 1980 within three months of its filing. G. L. c. 59, §§ 64, 65.[1] The board took jurisdiction and promulgated a decision. Upon request of the parties, the board also issued a report and findings of fact in support of its decision. See G. L. c. 58A, § 13. In its report, the board relied solely on what it considered to be the only probative evidence of fair cash value presented by the appraiser for the assessors. The board concluded that the value of Montaup's property exceeded the assessed value. Accordingly, the board decided in favor of the assessors for the fiscal years in question.

Because Montaup did not request that a stenographic report be taken of the board's proceedings, we are precluded from considering any question concerning the admission or exclusion of evidence, or whether any finding by the board was warranted by the evidence. G. L. c. 58A,

---

[1] Montaup also claimed that the town had taxed its property in disproportion to the other property in the town of Whitman. Montaup does not raise this issue before us on appeal.

§ 10.[2]  *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth,* 368 Mass. 745, 749-751 (1975).  On this appeal, Montaup may prevail only if an error of law is shown by the board's findings of fact and report.  G. L. c. 58A, § 10.

*Determination of fair cash value.*  Montaup contends that the board erred by disregarding the evidence presented by its treasurer of the net book cost or rate base value of its property in determining fair cash value and, in fixing the value of the property, by relying only on the evidence of net replacement cost offered by the appraiser for the assessors. The assessors claim that Montaup failed to produce any expert evidence correlating rate base value with fair cash value.  Accordingly, the assessors argue, Montaup did not sustain its burden of proving that the assessors assessed the property based on a dollar amount higher than its fair cash value.  See *Schlaiker* v. *Assessors of Great Barrington,* 365 Mass. 243, 245 (1974).[3]

In determining the fair cash value (or fair market value) of property, assessors must seek to determine the price that a willing buyer, not compelled to buy the property, would pay to a willing owner, not under compulsion to sell the property.  See *Assessors of Quincy* v. *Boston Consol. Gas Co.,* 309 Mass. 60, 63 (1941); G. L. c. 59, § 38.  A proper valuation depends on a consideration of the myriad factors

---

[2] General Laws c. 58A, § 10, as amended by St. 1933, c. 321, § 5, provides in relevant part:  "At the request of any party made before any evidence is offered, the board shall order that all proceedings in a pending appeal be officially reported by a stenographer . . . .  If no party requests that the proceedings be reported, all parties shall be deemed to have waived all rights of appeal to the supreme judicial court upon questions as to the admission or exclusion of evidence, or as to whether a finding was warranted by the evidence.  The right of appeal upon *questions of law* raised by the pleadings or . . . *shown by the report of the board* shall not be deemed to be waived" (emphasis added).

[3] Montaup also argues error in the board's refusal to consider Montaup's treasurer's opinion on net replacement cost of the property because, in the board's view, he was not qualified as an expert appraiser or engineer.  We need not reach this issue in light of our conclusion that the board erred in its treatment of the main issue of the proper method of determining fair cash value.

that should influence a seller and buyer in reaching a fair price. Various methods may be relevant in making the determination of fair market value. See *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 301-302 (1982); *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 566 (1956); *Assessors of Quincy* v. *Boston Consol. Gas Co.*, *supra* at 64, 66.

The rate base value, or net book cost, which is the original cost of property when first devoted to a public use, less accrued depreciation, constitutes one relevant method of determining fair cash value. *Boston Edison Co.* v. *Assessors of Watertown*, *supra* at 301. Evidence of comparable market sales and capitalized net earnings also may constitute legitimate methods for determining the fair cash value of property. See *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 362 (1978). In valuing special purpose property, the current replacement cost, or reproduction cost of the property less depreciation (DRC), may also prove probative of fair cash value. See *id.* at 363-364; *Assessors of Quincy* v. *Boston Consol. Gas Co.*, *supra* at 66. No one of these methods necessarily is decisive on the valuation issue. *Id.* at 66-67.

In assessing the property of an electrical utility company for property taxation purposes, this court has recognized the feasibility of using both the DRC approach and the rate base value. *Boston Edison Co.* v. *Assessors of Watertown*, *supra* at 301-302. Since utility company property is special purpose property concerning which there is little, if any, evidence of comparable sales, the DRC approach has been considered an appropriate criterion in estimating the fair cash value. See *id.* at 301; *Assessors of Quincy* v. *Boston Consol. Gas. Co.*, *supra* at 66. As a general principle, the DRC approach focuses on the current cost of reproducing the particular property involved and thus constitutes an appropriate method of valuing special purpose property. *Boston Edison Co.* v. *Assessors of Watertown*, *supra* at 304.

In *Boston Edison Co.* v. *Assessors of Watertown*, *supra*, however, we concluded that governmental restrictions on

the financial returns of a utility company are also relevant to the price which a willing buyer would pay to a willing seller for utility property. See *id.* at 304-305. In the *Watertown* case, Boston Edison Company (Edison), an electrical utility company regulated by the Department of Public Utilities, appealed from a decision of the board. Edison challenged the board's valuation of its property since it was based almost entirely on the DRC method with only minimal weight given to rate base value. *Id.* at 299.[4]

In that case, experts for both parties presented their calculations of rate base value and the DRC of the utility's property. The board accepted the evidence presented by Edison's expert as to the rate base value of the property. Although the board arrived at a lower depreciated reproduction cost than that testified to by the assessors' expert, their determination of the property's fair cash value revealed an almost total reliance on the DRC method.

In determining whether the board correctly decided to accord almost complete weight to the DRC method, we considered, and rejected, Edison's argument that the rate base value equals the highest amount at which the property of a utility company can be valued for local taxation purposes. *Id.* at 302.[5] The original cost of the utility's property, less an annual rate of depreciation, does not definitively measure the sale price of the property in a free and open market. *Id.* at 303-305.[6] We reasoned, however, that

---

[4] In estimating the fair cash value, the board gave 95% weight to the DRC and only 5% weight to the rate base value. *Id.* at 299.

[5] The *Watertown* court noted that several other State courts had rejected the idea that a utility property's rate base value constitutes the maximum dollar figure in estimating the fair cash value of the property. *Id.* at 302-303 n.5. See, e.g., *New Haven Water Co.* v. *Board of Tax Review of New Haven,* 166 Conn. 232, 237-238 (1974); *Maine Consol. Power Co.* v. *Farmington,* 219 A.2d 748, 750 (Me. 1966); *Public Serv. Co.* v. *Ashland,* 117 N.H. 635, 638-639 (1977). Accordingly, we reject similar claims made by Montaup in this case.

[6] We noted in *Boston Edison Co.* v. *Assessors of Watertown* that the rate base value does not represent the value of utility property to a buyer whose earnings are not limited to a return calculated on the seller's rate

governmental restrictions which affect the value or earning power of utility property ordinarily must be considered in determining fair cash value.[7] Cf. *Community Dev. Co. v. Assessors of Gardner*, 377 Mass. 351, 354 (1979) (board must consider Federal restrictions on rents received by owners of low income housing projects in calculating fair cash value of rental property for local taxation purposes). Fair cash value will be affected if a regulated utility may receive as earnings no more than a reasonable return on, or designated percentage of, its rate base value. Moreover, when a utility company sells an asset to another regulated utility company, the buyer's return on the property transferred is limited to the rate base value in the hands of the seller, and not on any higher purchase price that the buyer might have paid.[8] See *Boston Edison Co. v. Assessors of Watertown*, 387 Mass. 298, 301 (1982). 1 A.J.C. Priest, Principles of Public Utility Regulation 189 (1969). Since a public utility buyer of Edison's property would thus be limited to a return on the seller's rate base value, we concluded that such a purchaser would not choose freely to pay more than this amount for the property since a better return could be obtained by investing the same money elsewhere. *Boston Edison Co. v. Assessors of Watertown, supra* at 305.

We recognized that certain circumstances could induce a buyer of utility property to pay more than the rate base value. For instance, the utility company's net earnings actually may exceed the rate of return approved by the regulatory agency, or the profit available from this trans-

base. *Id.* at 303. See, e.g., *Consumers Power Co. v. Big Prairie*, 81 Mich. App. 120, 133 (1978) (potential buyers not subject to regulatory agency's restrictions on earnings might pay more than rate base value for utility company's property); *Independent School Dist. No. 99 v. Commissioner of Taxation*, 297 Minn. 378, 385 (1973) (since utility rates only partially regulated, owner paid amount in excess of net book value for property).

[7] In Montaup's case, the board noted that the FERC allowed its electrical utility companies a rate of return of "roughly 12%" on the net book cost or rate base value.

[8] The FERC also adheres to this rate base carry-over practice.

action may exceed that which an investment of comparable risk could bring in the open market. *Id.* at 305-306. It is also possible that the applicable regulatory agency may change its policies and abandon the carry-over rate base principle, thereby making an investment in the company more attractive. Some of the personal property of a public utility also may be purchased by a nonutility buyer which would not be subject to the governmental limitations on its profit. We decided, however, that mere speculation by the board on these possibilities did not warrant its almost exclusive reliance on the DRC approach absent "(a) substantial evidence on this record or (b) a reasonable basis in logic for ignoring almost entirely the fact that a potential buyer, if it were a public utility, would be considerably influenced by the return to which it would be limited on whatever investment it made." *Id.* at 304.[9] We concluded that "[a]s long as the standard to be applied is fair cash value . . . the record must show why a willing buyer would reasonably be expected to pay the value placed on the property by the board" which totaled an amount substantially higher than the property's rate base value. *Id.* at 306-307. Since the record was insufficient in this respect, and the board erroneously based its valuation almost completely on DRC, we

---

[9] The *Watertown* court further stated that it could see "no reason why a willing buyer would pay $15,229,793 (the board's determination of fair cash value in 1976) to purchase property on which it would expect to obtain an annual return of approximately $790,000 or . . . (9½% of $8,328,861 [Edison's net book cost])." *Id.* at 305.

Other State courts have recognized the significance of the utility company's regulated return on the fair cash value of its property for taxation purposes. See, e.g., *Texas E. Transmission Corp.* v. *Carteret,* 116 N.J. Super. 9, 16-17 (1970), aff'd, 58 N.J. 585 (1971) (per curiam) (original cost less depreciation approach proper in valuing property since income of utility company limited to percentage of that amount); *Pacific Power & Light Co.* v. *Department of Revenue,* 286 Or. 529, 534-535 (1979) (absent effective rebuttal evidence, rate base value sets ceiling on fair market value of utility property for taxation purposes); *Barnet* v. *New England Power Co.,* 130 Vt. 407, 411, 412-413 (1972) (rate base value must be considered in determining fair market value of utility company given Federal regulation on profits; however, other criteria should be applied if relevant under circumstances).

remanded the case to the board for a redetermination of fair cash value.

Montaup correctly relies on the *Watertown* decision as controlling precedent in this case. The board had the benefit of the *Watertown* case when it rendered its decision on Montaup's appeal.[10] Although relevant to the facts before it, the board chose not to apply the principle espoused in that case. The board correctly stated that the fair cash value of property "could not be proved with mathematical certainty and must ultimately rest in the realm of opinion, estimate and judgment." *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 72 (1941). The board also conceded that the governmental limitation on public utilities' earnings constitutes one factor in arriving at the fair cash value of utility property. Furthermore, the board recognized that the FERC regulated the rates which Montaup charged customers for electricity, and that the FERC allowed a rate of return of "roughly 12%" on the rate base value of the company's property. However, in rejecting Montaup's contention that the rate base value of its property necessarily equalled its fair cash value, the board decided that it was not given sufficient evidence from which it could accord a particular weight to the rate base value. Adhering to the standard which we overruled in the *Watertown* case, the board stated that "compelling evidence might be produced in a particular case where the . . . condition and prospects of a utility company, the state of the economy and other relevant facts might require a finding of fair cash value to be at or even below rate base value." Absent significantly more evidence concerning the nature of Montaup's business, its financial structure, its past profits, and potential for future profits, the board concluded that it could not determine the degree of weight to give to rate base value in estimating the fair cash value of the property.

---

[10] The board's decisions were promulgated on January 22, 1982, but its findings of fact and report on the matter were not rendered until December 16, 1982. The *Watertown* case was decided on August 27, 1982.

By disregarding the admittedly credible evidence of rate base value and relying exclusively on the DRC, the board contravened the principle of the *Watertown* case. Although the burden of establishing overvaluation is on the taxpayer, *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 691 (1982), the taxpayer, which is a regulated utility, should not be required to establish the lack of special circumstances which were enumerated in *Watertown*, until there is some evidence offered by the assessors to show that, because of such circumstances, the relevance of rate base value is put in question. The board "nowhere explains, by reference to substantial evidence or to reasoned principle, why a buyer would want to pay more than [the taxpayer's] net book value, when by investing the same dollars elsewhere that buyer could obtain a better return." *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 304-305 (1982). There is no indication in the board's opinion that the assessors presented any evidence at all which forecasted a change in the utility company's net earnings, as currently regulated, nor did the board assert that a change was likely in the FERC's rate base carry-over policy. The board does not rely on evidence showing that the profit available to a prospective purchaser of Montaup's property exceeded that obtainable from an investment with comparable risks. Finally, the board does not rely on any evidence to raise the possibility that any purchaser other than another utility company might buy the Montaup property. See *Boston Edison Co.* v. *Assessors of Watertown, supra* at 306. The board thus did not rely on either "substantial evidence" or "a reasonable basis in logic" for ignoring the rate base value, which significantly influences the price that a public utility company would be willing to pay for Montaup's property.[11] Thus, the board rejected Montaup's evidence of

[11] The board is misplaced in its reliance on the decision of the Kansas Supreme Court in *Northern Natural Gas Co.* v. *Dwyer*, 208 Kan. 337 (1971). In that case, the tax board accepted the opinions of the parties' experts who gave little or no weight to rate base value, relying almost entirely on the DRC approach in valuing the property. *Id.* at 351, 358. The tax board, however, had received evidence from the experts concern-

rate base value without presenting any legitimate reasons for its decision.

Since the board did not consider why, in the circumstances of this case, a willing buyer would not be influenced by the rate base value and reasonably would pay the higher DRC for Montaup's property, we must reverse the decision and remand the case to the board for a redetermination of fair cash value. See *Boston Edison Co.* v. *Assessors of Watertown, supra* at 306-307.

*So ordered.*

.

---

ing the utility company's net earnings over a number of years based on its operating income and its stock, the company's capitalization rates, the gross value of Northern's property over a period of years, the company's history of growth, and its future production capacity. *Id.* at 355-356. Based on this record, the Kansas court decided that the tax board had correctly estimated the fair market value of the utility property relying on the DRC approach. *Id.* at 358. Had the board in the present case received and relied on evidence indicating that rate base value did not indicate accurately fair cash value, and that the DRC method constituted a more realistic approach, its decision might not have run afoul of the *Watertown* principle. See *Boston Edison Co.* v. *Assessors of Watertown, supra* at 304, 306-307.