STATE of Wisconsin EX REL.
WISCONSIN RIVER POWER COMPANY, Petitioner-Appellant,

v.

BOARD OF REVIEW OF the TOWN OF ARMENIA
and Town of Armenia, Respondents.†

Court of Appeals

*No. 83–2021. Argued January 17, 1985.—Decided May 23, 1985.*
(Also reported in 370 N.W.2d 580.)

† Petition to review denied.

For the petitioner-appellant there were briefs by *Timothy C. Frautschi* and *Foley & Lardner* of Milwaukee, and oral argument by *Timothy C. Frautschi.*

For the respondents there was a brief by *J. Leroy Thilly* and *Boardman, Suhr, Curry & Field* of Madison, and oral argument by *J. Leroy Thilly.*

Before Gartzke, P.J., Dykman, J., and Rudolph T. Randa, Reserve Judge.

GARTZKE, P.J. Wisconsin River Power Company appeals from a judgment affirming the decision of the Town of Armenia's board of review upholding the 1980 valuation of that part of the company's dike which is in the township. The dispute is over the fair market value of the dike. The issue is whether the record supports the assessor's valuation. We conclude that it does not. We therefore reverse.

The company objected to the assessor's 1980 valuation of that part of its dike within the township at $1,502,000. The board of review held a hearing on the objection. Only the company presented evidence. The board upheld the assessor's valuation. The circuit court vacated the board's decision, concluding that the record did not support the valuation. The board held a second hearing. Both sides presented evidence. The company contended that the fair market value of the dike January 1, 1980 is

$352,688. The board again upheld the assessor's $1,-502,000 valuation, and the circuit court affirmed that decision.

The company operates a hydroelectric generating project on the Wisconsin River. The project includes a dike, 25,725 lineal feet of which are in the Town of Armenia. The project is owned equally by Consolidated Water Power Company,[1] Wisconsin Public Service Corporation and Wisconsin Power & Light Company. The entire project's original cost was $20,198,239. Its net book value (original cost less depreciation) was $11,786,169 January 1, 1980.

The company is licensed under The Federal Power Act to operate the project for fifty years. The license expires in 1998. The Federal Energy Regulatory Commission's approval is necessary to transfer the license. 16 USC sec. 801 (1982). The successor or assignee of the license takes subject to its terms and conditions. *Id.* The company cannot sell, lease or otherwise dispose of the whole of its facilities unless FERC finds that the proposed disposition is consistent with the public interest. 16 USC sec. 824b(a). The United States may take over and operate the project when the license expires if it pays the owner its net investment. 16 USC sec. 807(a).

The company sells its power at wholesale. FERC regulates the rates, which must be "just and reasonable" and therefore enough to allow recovery of operating costs and a fair rate of return on investment. *Anaheim, Riverside, etc. v. Fed. Energy Reg. Com'n,* 669 F.2d 799, 801 (D.C. Cir. 1981). Net investment is defined as original cost less depreciation plus improvements. 16 USC sec. 796(13). A surplus earned over the specified rate of re-

---

[1] Consolidated Papers, Inc., is the parent-owner of Consolidated Water Power.

turn on the net investment after the first twenty years of operation must be held in an amortization reserve. FERC may require that the reserve be applied to reduce the net investment or be held until the termination of the license. 16 USC sec. 803(d).

With this background in mind, we state the scope of our review. Judicial review of the board's decision is by statutory certiorari. Sec. 70.47(13), Stats. Review on statutory certiorari is the same as on common law certiorari, when the statute does not enlarge the scope of review. *State ex rel. Ruthenberg v. Annuity & Pension Bd.*, 89 Wis. 2d 463, 474, 278 N.W.2d 835, 840 (1979). We review the same record made before the board of review as did the trial court, and we are not bound by that court's conclusions.

The assessor's valuation is presumed to be correct. The presumption survives until credible evidence overturns it. *Rosen v. Milwaukee,* 72 Wis. 2d 653, 661–62, 242 N.W. 2d 681, 684 (1976). If the presumption is overcome, the question is whether credible evidence was presented to the board that may in any reasonable view support the board's determination. *Id.* at 662, 242 N.W.2d at 684. If the board has not acted arbitrarily and the evidence furnishes a substantial basis, the court will affirm the board's determination. *East Briar v. Rome Board of Review,* 113 Wis. 2d 33, 35–36, 334 N.W.2d 692, 694 (Ct. App. 1983). The court does not substitute its opinion of value for that of the board of review. *Id.* The board cannot, however, disregard competent, unimpeached and uncontradicted evidence. *Id.* If the board disregards such evidence, the court must set aside its determination.

We turn to the record made before the board. We conclude that the company overcame the presumption that the assessor's $1,502,000 valuation is correct.

Assessors must value property in the manner provided in the Wisconsin Property Assessment Manual. Secs. 70.32(1) and 73.03(2a), Stats. The manual requires that the assessor use the best data available to arrive at an assessment. 1 *Property Assessment Manual for Wisconsin Assessors*, 7–3 to 7–4 (Rev. 1982). This involves consideration of the market, cost and income approaches to value.

The company's appraiser, an officer of the regulated industries division of American Appraisal Company, testified that because no comparable sales are available, he did not use the market approach. In his opinion, a reasonable investor would value the project on the basis of its income-producing potential. He testified that FERC limits the company's return to a percentage of its "rate base" or original cost less depreciation and does not generally approve sales of federally licensed projects for more than net book value if the purchaser will pass on the excess cost to consumers. He concluded that no reasonable investor would pay more than net book value for the project. The net book value of the company's project was $11,786,169 January 1, 1980. The dike is carried in the company's account for "Reservoirs, Dams and Waterways." The appraiser allocated $352,688 from that account to the part of the dike in the town as that part's fair market value January 1, 1980.

The company's appraiser also valued the project at $11,786,169, using the cost approach. He first calculated the project's reproduction cost less depreciation. He reduced that amount to the project's net book value because its rates are regulated. In his view, rate regulation is an economic obsolescence factor that must be considered under the cost approach.

We conclude that the company's appraiser valued the property in the manner provided in the Wisconsin Prop-

erty Assessment manual, as must the town assessor under secs. 70.32(1) and 73.03(2a), Stats. The appraiser arrived at an opinion based upon facts which he presented to the board. The connection between those facts and his opinion employs a logical rationale. Consequently, the appraiser's opinion is reasonable. The company therefore came forward with credible evidence that the assessor's valuation is incorrect and overcame the presumption in favor of that valuation. *Rosen,* 72 Wis. 2d at 662, 242 N.W.2d at 684.

Because the presumption favoring the assessor's valuation was overcome, the next question is whether credible evidence was presented to the board that may in any reasonable view support the assessor's valuation. *Id.*

The assessor testified only at the second hearing. He bases his valuation solely on net reproduction cost, citing sales of other utility properties at prices over net book value. He used his predecessor's valuation, having determined from Army Corps of Engineers personnel that his predecessor had conservatively estimated the dike's replacement cost less depreciation. He analyzed his $1,502,-000 valuation, using the 1979 report which American Appraisal Company had submitted at the first hearing. The appraisal company's $356,715 valuation as of January 1, 1979 was 4.8 percent of the company's account for "Reservoirs, Dams and Waterways" as of that date. He applied the 4.8 percent, to the appraisal company's finding in the 1979 report of a $28,868,045 reproduction cost less depreciation for the reservoirs, dams and waterways. He compared the result, $1,385,660, with his $1,502,000 original valuation. He considered the difference to be reasonable in view of the high inflation rate in 1979. He made no adjustment to net reproduction cost for income limitations on the project and did not use the income or market approach.

The town called its 1981 assessor even though he did not participate in the 1980 valuation at issue. He testi-

fied that the project's reproduction cost less depreciation in 1980 was $45,000,000 to $55,000,000. He based his opinion on the costs of recently constructed facilities and on his conversations with engineers. He assumed that a buyer would be able to earn a return on the entire purchase price but subtracted a "negligible" amount to account for the possibility that the purchaser would not. He did not offer an opinion as to the dike's value in 1980.

The general manager of Kaukauna Electric and Water Company, a municipally-owned utility, testified that his company is interested in purchasing additional hydrocapacity. In his opinion, $26,000,000 is a low valuation of the Wisconsin River Power project. His company would "jump" at the chance to purchase the project at its net book value, $11,786,169. That price equals about $336 per kilowatt capacity. One Wisconsin utility has offered its coal-fueled plant for sale at about $1,500 per kilowatt of its capacity. Another coal-fueled plant has been offered at approximately $750–$800 per kilowatt. Neither offer has been accepted. No hydrounits are being offered for sale. A hydrounit is preferable because it needs no fuel. Kaukauna's production cost is about .5¢ per kilowatt hour, and the cost of the power it purchased in 1980 was 2.45¢ per kilowatt hour. The cost of the company's power is .92¢ per kilowatt hour. The purchase price of the project would become more attractive as the sale price approached net book value, assuming that the restrictions in the Wisconsin River Power license (with which he is not completely familiar) are similar to the Kaukauna Electric licenses, and that his company could overcome the major obstacle of having to pay for the use of another company's lines to transmit the power from the project to another location. He offered no opinion on the value of the dike.

The town's attorney put in copies of FERC orders approving transfers of project licenses that it found were in the public interest. He submitted a copy of a FERC

order approving the buyer's request to include in its rate base the amount it paid over net book for facilities. He also introduced copies of orders by Wisconsin Public Service Commission approving sales of facilities in excess of net book and in one case at net reproduction cost. PSC required the buyers to accept the sellers' rate base in these facilities but permitted the buyers to amortize the amount paid in excess of net book against expenses over a period of years.[2]

When upholding the assessor's 1980 valuation of the dike, the board reasoned as follows: No legal limit exists on a price for the project. Utilities have purchased physical assets at above original cost less depreciation. Regulatory agencies have approved sales of utility assets at reproduction cost depreciated. The board "considered" and rejected the income approach taken by the company's appraiser. The effect of income limitations on the value of the project cannot be determined without knowing the particular facts of the transaction. The income approach depends on the amount of investment one assumes the regulator will permit the owners to recover from rate payers. The company's income approach would yield a lower valuation each year because of depreciation, unless improvements are made, and is unreasonable. The project would be substantially undervalued at its depreciated original cost because it produces power at a cost substantially below average, and the relative value of hydroelectric projects has been increasing in recent years. Some buyers would measure its value on the basis of the relative value of the power it produces, not on the basis of FERC rate regulation. The board accepted the assessor's valuation as a reasonable estimate of reproduction cost less depreciation January 1, 1980.

[2] The company attached to their brief several FERC orders, some of which approached sales of facilities at net reproduction cost.

We are not the first court faced with the issue whether an assessor in valuing a utility's property for tax purposes can completely ignore evidence that the utility is subject to rate regulation. Other courts have held that the evidence cannot be ignored. *Montaup Elec. v. Bd. of Assessors of Whitman,* 460 N.E.2d 583, 586 (Mass. 1984), *Boston Edison Co. v. Board of Assessors, etc.,* 439 N.E.2d 763, 767 (Mass. 1982); *Public Serv. Co. of N.H. v. Town of Ashland,* 377 A.2d 124, 126 (N.H. 1977); *New England Power Company v. Town of Barnet,* 367 A.2d 1363, 1367 (Vt. 1976); *New Haven Water Co. v. Board of Tax Review,* 348 A.2d 641, 644 (Conn. 1974); *Independent Sch. Dist. No. 99 v. Commissioner of Tax.,* 211 N.W.2d 886, 890 (Minn. 1973).

The Massachusetts Supreme Court dealt with the issue realistically in *Boston Edison, supra,* and *Montaup, supra.* The *Boston Edison* court reversed a valuation of a state regulated utility's property, based almost exclusively on reproduction cost less depreciation, with only minimum weight to net book or rate base value. The court agreed that the net book value is not an upper limit on the value for purposes of taxation. It recognized that circumstances could induce a buyer to pay more than the value of the utility's rate base. The utility's actual earnings might exceed its approved rate of return. The return from the investment might exceed the return available elsewhere. The governing regulatory agency might reasonably be expected to abandon the principle by which the buyer takes the seller's rate base. The growth potential might warrant a higher price. The property could be purchased by a nonregulated buyer. 439 N.E.2d at 768–69. Notwithstanding those possibilities, the court held that the record "must show why a willing buyer would reasonably be expected to pay the value placed on the property by the board," and because

the record did not, the court remanded for a redetermination. *Id.* at 769.

Relying on *Boston Edison, supra* (to which it refers as the *"Watertown* case"), the Massachusetts Supreme Court in *Montaup, supra,* set aside a valuation based on 95 percent of net reproduction cost and 5 percent of the utility's rate base. The court said:

Although the burden of establishing overvaluation is on the taxpayer, the taxpayer, which is a regulated utility, should not be required to establish a lack of special circumstances which were enumerated in *Watertown,* until there is some evidence offered by the assessors to show that, because of such circumstances, the relevance of rate base value is put in question. The board "nowhere explains, by reference to substantial evidence or to a reasoned principle, why a buyer would want to pay more than [the taxpayer's] net book value, when by investing the same dollars elsewhere that buyer could obtain a better return." There is no indication in the board's opinion that the assessors presented any evidence at all which forecasted a change in the utility company's net earnings, as currently regulated, nor did the board assert that a change was likely in the FERC's rate-base carry-over policy. The board does not rely on evidence showing that profit available to a prospective purchaser of Montaup's property exceeded that obtainable from an investment with comparable risk. Finally, the board does not rely on any evidence to raise the possibility that any purchaser other than another utility company might buy the Montaup property. The board thus does not rely on either "substantial evidence" or "a reasonable basis in logic" for ignoring the rate base value, which significantly influences the price which a public utility would be willing to pay for Montaup's property.

460 N.E.2d at 588. (Citations omitted.)

The Massachusetts approach is realistic because it takes into account all relevant factors. It recognizes that factors other than the return on investment allowed by law have affected the value of some properties, but re-

quires a showing that those factors can reasonably be expected to affect the value of the property in question. It requires a logical connection between such factors and the tax value placed on a property. It avoids the arbitrariness of fixing a value based solely on the allowed return when other factors could reasonably be expected to increase that value. It avoids the arbitrariness of fixing a value on the basis of factors which have not reasonably been shown to bear on that value.

Thus, valuation should not stop with the principle announced in several cases holding that a utility's net book value is not the upper limit of value for property tax purposes merely because it is subject to rate regulation. *See Wisconsin Gas & Electric Co. v. Tax Comm.*, 221 Wis. 487, 509–10, 266 N.W. 186, 195–96 (1936), *Kittery Electric Light Co. v. Assessors of Town*, 219 A.2d 728, 737 (Me. 1966) ; *Independent Sch. Dist. No. 99*, 211 N.W.2d at 890 ; *New England Power Company*, 367 A.2d at 1367 ; *New Haven Water Co.*, 348 A.2d at 643. Those decisions, like *Montaup Elec., supra,* and *Boston Edison Co., supra,* support the proposition that factors exist in addition to a utility's rate base that may affect the fair market value of its property and are consistent with the Massachusetts approach to valuation. The Massachusetts cases hold that such of those factors as are relevant to the property being valued should be considered.

Returning to the case on appeal, the evidence does not support the board's total rejection of the company's valuation. The board had evidence that FERC generally will not allow the buyer of a utility to earn a return on an investment greater than the company's original cost less depreciation. It also had evidence that some buyers have paid more than the original cost less depreciation for some utility property, one buyer having paid reproduction cost less depreciation. The board had insufficient evidence, however, that any buyer could be reasonably expected to pay more than net investment less deprecia-

tion for the company's project. It had no evidence that FERC could reasonably be expected, for example, to authorize a buyer of the company's project to earn a return on a higher rate base than the company's original cost less depreciation, or that the company's return on its investment exceeds returns available elsewhere. *See, e.g., Montana Power Co. v. Federal Energy Reg. Com'n,* 599 F.2d 295 (9th Cir. 1979) (FPC did not err by fixing buyer's rate base at $156,117, the depreciated original cost, to prevent consumers from paying twice for same asset, although buyer paid $3,250,000).

The testimony of the manager of Kaukauna Electric indicates that his company would be interested in acquiring the company's project at a price exceeding its net book value. The manager failed, however, to place a particular value on the project, except to say that $26,-000,000 was low and that the price would become more attractive as it approached net book value. He acknowledged that the restrictions on the Wisconsin River Power license would affect the value, and that the cost to transmit power from the project to another location was a "major obstacle," but did not relate those negative factors to the value of the project to a buyer such as his company. His testimony does not support the board's exclusive reliance on the project's net reproduction cost.

We do not suggest that a witness must state that he or his company is willing to pay or accept a certain price. Specified factors, such as comparatively low production costs, may affect the value to a class of buyers. The existence of members of that class may be shown, but all factors affecting value to that class should be taken into account when evidence is offered of that value.

During oral argument, the company requested that we instruct the circuit court to direct the board to value the dike on the basis of the present record, relying on *State ex rel. Keane v. Board of Review,* 99 Wis. 2d 584, 299

N.W.2d 638 (Ct. App. 1980) and *State ex rel. I.B.M. Corp. v. Board of Review,* 231 Wis. 303, 285 N.W. 784 (1939). We will not do so.

In *Keane,* we directed the circuit court to enter judgment vacating the assessments because the board of review had ignored uncontroverted comparable sales, the best evidence of fair market value. 99 Wis. 2d at 596–97, 299 N.W.2d at 644–45. The *State ex rel. IBM Corp.* court was convinced that one valuation method was fair and just. The court remanded, suggesting a method to value the taxpayer's property. 231 Wis. at 314–15, 285 N.W. at 789. We are not convinced that only one method will result in a fair and just value of a utility's property. We conclude that the board may conduct further hearings if it decides not to accept the company's evidence of fair market value.

Accordingly, we will reverse the judgment and direct that the circuit court remand the matter to the board.

*By the Court.*—Judgment reversed and cause remanded with directions.