LeRoy F. Jost, Plaintiff-Appellant, v. Anita P. Jost, Defendant-Respondent.

Supreme Court

*No. 76–400.  Argued March 28, 1979.—Decided May 30, 1979.*
(Also reported in 279 N.W.2d 202.)

For the appellant there were briefs by *Roland J. Steinle, Jr.*, attorney, of Cedarburg, and *William Fitzhugh Fox*, of counsel, of Milwaukee, and oral argument by *Mr. Fox*.

For the respondent there was a brief and oral argument by *Eugene A. Kershek* of Milwaukee.

DAY, J.   This is an appeal from an order entered December 3, 1974 by the county court of Waukesha County, the Honorable Robert T. McGraw, County Judge, presiding, reopening a judgment of divorce on the ground that LeRoy Jost (plaintiff in the divorce) had fraudulently failed to disclose ownership of an asset in the form of corporate stock at the time of the divorce hearing, and from an order entered October 8, 1976 by the county court of Waukesha County, Judge McGraw again presiding, modifying the original divorce judgment.

The questions on appeal are:

1. Was the finding by the trial court that the stock was worth seven dollars per share at the time of the divorce trial against the great weight and clear preponderance of the evidence?

2. Did the trial court fail to take into consideration the tax ramifications of the property division?

3. Did the trial court abuse its discretion in failing to make the property division "in kind?"

Other issues raised by Mr. Jost will be discussed in the balance of this opinion.

LeRoy and Anita Jost were divorced on February 9, 1973 in the county court of Waukesha County. The husband was the plaintiff in the action, but the divorce was awarded to the defendant wife following a trial held November 29 and 30, 1972. An amended judgment of divorce, providing for custody, alimony, child support, and division of property was entered May 29, 1973.

In a petition dated September 15, 1973, Mrs. Jost asked the trial court to re-evaluate the husband's assets at the time of the divorce trial, alleging that Mr. Jost had fraudulently concealed ownership of 100,000 shares of stock in Tolley International Corporation. Judge McGraw signed an order September 18, 1973 ordering Mr. Jost to show cause why testimony should not be taken to ascertain his total assets at the time of the divorce trial, and why the judgment should not be reopened.

Based on the testimony of Mr. Jost at the original divorce trial and the record made at the hearing on the petition to reopen the divorce judgment the trial court found that Mr. Jost "had fraudulently failed to disclose those assets at the time of the divorce hearing."[1]

The circumstances under which Mr. Jost acquired 100,-000 shares of Tolley International stock were as follows.

Mr. Jost was a vice president and board member of the Tolley International Corporation, a consulting firm that provides actuarial and administrative services to trustees of employee fringe benefit plans. At the time he joined the firm, it was doing business as Russell M. Tolley & Associates, and in 1967 it merged with Levin-Townsend

---

[1] At oral argument counsel for Mr. Jost withdrew objection to the reopening of the judgment based on fraudulent concealment of assets.

Service Corporation, as a subsidiary of Rockwood Computer Corporation. Mr. Jost had shares in the original company and as a result of the merger, he acquired 1,873 shares in Levin-Townsend. These shares were owned jointly with Mrs. Jost.

On March 31, 1971, Russell M. Tolley, Chairman and President of Tolley International, repurchased the company from Rockwood, and his key employees were given an opportunity to buy stock in Tolley International.

The record shows that Mr. Jost signed a "Stock Purchase Agreement," dated April 1, 1971, agreeing to buy 100,000 shares of Tolley International. Mr. Jost testified that he actually signed the agreement at the end of June, 1971. At this time, the stock was pledged as collateral by Mr. Tolley to secure the loan he had obtained from Indiana National Bank to repurchase the company from Levin-Townsend. The Stock Purchase Agreement characterized the transaction as a "conveyance." Mr. Jost paid a $15,000 down payment for the stock, and paid interest on the note to Indiana National Bank, based on his share of the stock pro-rated. His 1972 tax return indicated that he paid interest that year to Indiana National Bank of $13,397.65.

At the hearing on the order to show cause, Mr. Jost called Gerald T. Slevin, a New York attorney specializing in corporate and securities work, who drafted the Stock Purchase Agreement. Mr. Slevin testified that he had spoken to Mr. Jost in a telephone conversation in November 1972. He said that he advised Mr. Jost that the Stock Purchase Agreement amounted to a "fancy option" to acquire Tolley International stock upon the satisfaction of a number of conditions, the most important of which was the payment of about $143,000 (his share of the Indiana National Bank note). The stock was also subject to restrictions of the federal securities laws, limiting transferability. Mr. Slevin said that he informed Mr. Jost that he could get value for his rights when the stock

was offered in a secondary public offering, and that he could not definitely say the public offering would take place. He also said that if Mr. Jost had not performed under the Stock Purchase Agreement, he could have "walked away" from the transaction without further liability.

Mr. Slevin, who also drafted the preliminary prospectus of Tolley International, said that the document set forth Mr. Jost as one of the "beneficial owners" of the stock as of August 12, 1972. In his opinion, "beneficial ownership" meant "the ownership of shares that a person would have the benefit of . . . at the time this offering was effective."

The record shows that Moody's Banks & Finance said that a stock registration had been filed with the Securities and Exchange Commission August 17, 1972 for a public offering of 400,000 shares. The public offering took place December 20, 1972, less than a month after the divorce trial, and Mr. Jost realized net proceeds of $103,873.49 for the sale of 42,323 shares. The note to Indiana National Bank was paid off from the gross proceeds of the sale. Upon the completion of the offering, he owned 57,677 shares of the stock.

Mr. Slevin testified that the reason the Stock Purchase Agreement was not characterized as an option was to constitute the transaction as a sale for tax purposes. Mr. Jost took a long term capital gain on his 1972 tax return, which states that he held the shares in Tolley International Corporation from March 1, 1971 to December 20, 1972.

The trial court found that Mr. Jost had a "concrete" interest in the stock at the time of the divorce trial November 29 and 30, 1972 and modified the property division to award Mrs. Jost the additional sum of $228,425.-72. This represented forty-five percent[2] of the net value

---

[2] Objection to forty-five percent division to the wife was withdrawn at the time of oral argument.

of the 100,000 shares of Tolley International as found by the court as of the date of trial.[3]

1. WAS THE FINDING BY THE TRIAL COURT THAT THE STOCK WAS WORTH SEVEN DOLLARS PER SHARE AT THE TIME OF THE DIVORCE TRIAL AGAINST THE GREAT WEIGHT AND CLEAR PREPONDERANCE OF THE DIVORCE?

Marital assets are to be valued as of the time of the granting of the divorce. *Sholund v. Sholund*, 34 Wis.2d 122, 132, 148 N.W.2d 726 (1967); *Dean v. Dean*, 87 Wis.2d 854, 275 N.W.2d 902 (1979).

The trial court based its finding on the fact that Tolley International was traded over the counter on November 29, 1972 for seven dollars "bid" and seven dollars and fifty cents "ask."

---

[3] In its decision the trial court arrived at the net value of the stock as follows:

"Total Value of Stock, 100,000 Shares × $7 =

| | gross value | $700,000.00 |
|---|---|---|
| Less Indebtedness | | |
| Underwriting discount | $ 26,663.49 | |
| Blue sky expenses | § 1,026.01 | |
| Legal fees | $ 4,617.05 | |
| Accounting fees | $ 3,462.79 | |
| Printing and engraving | $ 2,503.62 | |
| Miscellaneous expenses | $ 855.01 | |
| Unpaid legal fees on acquisition of stock | $ 4,701.71 | |
| Profit sharing guarantee | $ 4,834.32 | |
| Unpaid interest, Indiana National Bank | $ 390.18 | |
| Note, Indiana National Bank | $143,333.33 | |
| Total indebtedness | $192,387.51 | |
| Net Value of Stock | | $507,612.49" |

Mr. Jost's argument is that the value of the stock should have been discounted to take account of "blockage," federal securities laws, and restrictive covenants. Mr. Jost offered no evidence as to value to contradict the expert testimony presented by Mrs. Jost. At the oral argument, his attorney conceded that Mr. Jost had made no record at trial.

Mr. Paul S. Connelly, a vice president of Robert W. Baird and Company, a brokerage firm, was called as an expert witness for Mrs. Jost. He testified that he had been a stockbroker since 1956 and during the past ten years had personally been involved in 25,000 sales or purchase transactions of stock. He estimated that he had been involved in a thousand stock appraisals during the same period. He stated that the Wall Street Journal, "is recognized as the bible of the investment community for what the price was on the previous day." He said he was familiar with Tolley International stock and that Baird's research man in Indianapolis, as well as their research man in Milwaukee, had visited the Tolley Company in 1973 to ascertain the desirability of its stock for recommendation to customers. He testified that he personally researched what Tolley International was selling for on March 31, 1971. He said the national stock summary showed three New York brokers with a bid of $5\frac{3}{8}$; $5\frac{3}{4}$; and $5\frac{1}{2}$; that it showed two Cleveland brokers with $5\frac{1}{4}$ and $5\frac{3}{8}$. He then explained the difference between "bid" and "ask" with reference to stock quotations. He testified that on June 30, 1971, the Wall Street Journal showed a price of $7\frac{1}{4}$ bid and $7\frac{3}{4}$ ask. On November 29, 1972, one of the dates of the divorce hearing, it was shown at 7 bid and $7\frac{1}{2}$ ask. The day before his testimony was offered, May 27, 1975, Tolley was shown with a bid price of $8\frac{1}{2}$ and an ask price of $9\frac{1}{4}$. Using Standard and Poor's as his source of information he testified that in 1974 Tolley stock had a high bid of $18\frac{1}{8}$ and a low bid of 5. In 1975, up through April, it had a high

bid of 16½ and a low bid of 7½. He testified that previous to 1974, the highest the stock had gotten was 13½. He was then asked if he was familiar with the Tolley International secondary offering on December 20, 1972 and explained that a secondary offering means that the company is not selling the stock but that currently the outstanding shares held by shareholders are being sold. He was familiar with the legend that had been placed on the stock that Mr. Jost had owned restricting its availability for sale prior to such registration.[4] He was familiar with the number of shares that were sold and the number that remained as a result of the stock purchase agreement. When asked:

"Q. If it should develop and appear that there is such a legend on the remaining shares, how could that legend effect your valuation as to the remaining stock that Mr. Jost still has in his possession?

"A. It would not reflect on my valuation of them . . . ."

---

[4] The stock purchase agreement provided that the shares bear the following legend:

"The shares represented by this certificate (i) have not been registered under the Securities Act of 1933, as amended (the '33 Act), (ii) have been acquired for investment and may not be sold or otherwise disposed of except by the laws of descent and distribution without the prior written consent of the Seller, unless the sale or other distribution (1) is pursuant to an effective registration statement under the '33 Act, (2) is one in regard to which the Seller shall have been advised by Cadwalader, Wickersham & Taft or other counsel acceptable to the Seller that registration under the '33 Act is not required, or (3) is one in regard to which the staff of the Securities and Exchange Commission has indicated in writing that it will recommend no action if such sale or other distribution occurs; and (iii) are subject to the terms and conditions of a stock purchase agreement dated as of April 1, 1971 between Martin Gallagher, LeRoy F. Jost, Joseph LaRosa, Leonard Teeuws and Russell M. Tolley, a copy of which is on file in the offices of Tolley International Corporation, 3901 North Meridian Street, Indianapolis, Indiana."

He said that the removal of the restrictive legend from the stock "doesn't go to the essence of value of the securities; it does go to the essence of negotiability." When asked if knowing that there may be such a legend on Tolley International corporate stock, would his opinion change as to the value that he had just testified to on the different dates he had indicated; his answer was no. When asked on cross-examination if it were shown that Mr. Jost could only sell a portion of that stock during the next several years because of registration restrictions, would it affect his valuation, his answer was, "I don't think so. It's worth what it's worth and priced at what it's worth . . . I don't see any other value that it could have." When asked upon cross-examination:

"*Question:* You wouldn't agree that by reason of that limitation alone that stock would be worth thirty-five percent less than what you testified to?
"*Answer:* I don't believe so."

The valuation of the Tolley International shares of stock as of November 29, 1972, as found by the trial court was not against the great weight and clear preponderance of the evidence.

As the court stated in *Wahl v. Wahl,* 39 Wis.2d 510, 516–17, 159 N.W.2d 651 (1968) where the issue was the valuation of the stock in a closely held corporation:

"Whether the trial court's valuation of the stock is against the great weight and clear preponderance . . . is, of course, the precise legal question here involved . . . . We think that as a prerequisite to a claim of a finding of a fair market value of close corporation stock is against the great weight and clear preponderance of the evidence, a party must present to the trial court evidence of the stock's market value, together with the method or methods of arriving at that value. Here the defendant offered little evidence on that issue."

Those observations apply with equal force in the instant case. The finding of the trial court as to value of the stock was not against the great weight and clear preponderance of the evidence and we must affirm it.

2. DID THE TRIAL COURT FAIL TO TAKE INTO CONSIDERATION THE TAX RAMIFICATIONS OF THE PROPERTY DIVISION?

In its decision, the trial court specifically stated that it was spreading payments of $228,425.72 (forty-five percent of the net value of the 100,000 shares of Tolley International) over ten years and one month for tax purposes. This qualifies the payments as "periodic payments" under 26 USCA, sec. 71(c)(2). Such periodic payments are included in the wife's gross income, and deductible by the husband. 26 USCA, sec. 71(a).

In *Wetzel v. Wetzel,* 35 Wis.2d 103, 110, 150 N.W.2d 482 (1967), the court said that while tax considerations are not controlling, the court should be aware of the tax consequences of any proposed property division:

"Disregarding the effect of taxes may result in an unrealistic and unjust result. We do not hold the trial court must adopt as a solution a method which produces the least amount of tax for the husband or for the wife, but in arriving at a determination of the business side of the divorce the tax impact is a consideration which permeates the whole process . . . . How the arrangement or division works out in reality after taxes is a test of fairness." 35 Wis.2d at 110.

The trial court clearly did take account of the tax consequences of the award. Mr. Jost gained a substantial tax advantage in being able to deduct his payments on his tax return. We are satisfied that the arrangements made by the trial court fully met the "test of fairness" discussed in *Wetzel.* We find no abuse of discretion in the trial court's method of payment.

## 3. DID THE TRIAL COURT ABUSE ITS DISCRETION IN FAILING TO MAKE THE PROPERTY DIVISION "IN KIND?"

Mr. Jost argues that the trial court abused its discretion in not making an "in kind" distribution of the Tolley stock, instead of a monetary award to Mrs. Jost. We find no merit in this argument. Had the trial court known of the existence of the shares at the time of the divorce, it could have ordered an in kind division of the asset. However, the shares remaining after the sale of December 20, 1972 had either been sold or encumbered at the time of the hearing.

Mr. Jost testified that the remaining shares no longer bore a restrictive legend. He also testified that he had sold 1,300 of the shares, and had pledged the balance of his shares as collateral on a debt owed to First Wisconsin National Bank for a $160,000 home.

There was no abuse of discretion in making a monetary award to Mrs. Jost.

The parties stipulated that the trial court should determine responsibility for a medical bill presented by a doctor for services provided for the minor son. The trial court took testimony from Mr. Jost to the effect that he did not believe that he was responsible for the bill since it was not covered by his medical insurance. The trial court considered the respective incomes of the parties, and found that Mr. Jost should be responsible for the bill. There was no abuse of discretion by the trial court in so ordering.

Issues raised by Respondent in her brief will not be considered because she failed to serve a notice of review as required by sec. 817.12, Stats., 1975.

*By the Court.*—Judgment affirmed.

COFFEY, J., took no part.