IN RE the MARRIAGE OF: Cynthia C. LIDDLE,
Petitioner-Appellant,

v.

Bradway A. LIDDLE, Jr., Respondent.

Court of Appeals

*No. 86–0299. Submitted on briefs March 10, 1987.—Decided
May 14, 1987.*

(Also reported in 410 N.W.2d 196.)

For the petitioner-appellant the cause was submitted on the briefs of *Jeffrey W. Younger* and *Lee, Johnson, Kilkelly & Nichol, S.C.,* of Madison.

For the respondent the cause was submitted on the brief of *Daniel A. Rottier* and *Habush, Habush & Davis, S.C.,* of Madison.

Before Dykman, Eich and Sundby, JJ.

DYKMAN, J.   Cynthia Liddle appeals from a judgment of divorce. The issues are whether the trial court erred in valuing assets by a method which considered future income taxes and minority ownership as factors affecting the fair market value of the assets, and whether the trial court abused its discretion by failing to award maintenance. Because the values found by the trial court were not clearly erroneous, we affirm its asset valuation. Because we find no abuse of discretion, we affirm the denial of maintenance.

Cynthia and Bradway Liddle were married in 1963 and have two children, one of whom is a minor. At the time of trial, Cynthia was forty-three years old, in good health, held a master's degree in education, and taught high school, earning $23,760 gross annually. Bradway was forty-six years old, in good health, had a law degree, was a partner in a law firm, and earned $86,000 gross annually. Though the parties stipulated to an equal property settlement, they disagreed as to the value of their assets. They also disagreed as to whether Cynthia should receive maintenance.

## ASSET VALUATION

The assets in controversy are Bradway's interest in general partnerships and limited partnerships, both of which own real estate, and stock in publicly-held corporations.

135

The division of the marital estate is discretionary, and we will sustain it if the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Schumacher v. Schumacher,* 131 Wis. 2d 332, 337, 388 N.W.2d 912, 914 (1986). However, the valuation of marital assets is a finding of fact which we will not upset unless clearly erroneous. Sec. 805.17(2), Stats.;[1] *In re Marriage of Weiss v. Weiss,* 122 Wis. 2d 688, 698, 365 N.W.2d 608, 613 (Ct. App. 1985); *Peterson v. Peterson,* 126 Wis. 2d 264, 265–66, 376 N.W.2d 88, 89 (Ct. App. 1985).

The only testimony as to the fair market value of the partnerships and stock came from Theodore Gunkel, a certified public accountant who owned a financial advisory consulting firm.[2] The firm worked on closely-held business valuations and valuations of financial interests in businesslike assets and untraded securities.

The parties agreed upon the appraised value of the real estate owned by the partnerships and the amount of mortgages or land contract balances appli-

---

[1]Section 805.17(2), Stats., provides in pertinent part:

Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

[2]Bradway contends that Gunkel's testimony was undisputed. While Cynthia did not produce expert testimony, she did dispute Gunkel's testimony, arguing that the appraisals and mortgage balances of the partnerships should be used to determine fair market value. Cynthia did not need expert testimony to advance her position that Gunkel's deductions could not be considered as a matter of law.

cable to each. Using these values, Gunkel arrived at the following fair market values for each asset:

| Asset | Fair Market Value |
|---|---|
| Homestead limited partnership | $21,000 |
| Twin Lakes limited partnership | 21,000 |
| Aardvark general partnership | 37,515 |
| Bra-Doc general partnership | (321) |
| Smedly Lot and Low-Cal general partnership | 1,599 |
| Salty Land & Storm Door general partnership[3] | (1,581) |

*Limited Partnerships — Reduction For Taxes*

Cynthia specifically attacks Gunkel's method of valuing Bradway's Homestead limited partnership interest. Gunkel defined Homestead as "A real estate tax shelter interest registered in Wisconsin. The partnership owns a Section 8 Low/Moderate income housing project in McFarland, Wisconsin — 56 units." Gunkel projected a probable continuation of partnership investment in the project of five to seven years from July 1985. Bradway owns an 11.875% interest in the capital and income, for which he paid $49,625 in four installments from 1981 to 1984.

Gunkel testified that he considered it mandatory to take into account the tax impact of Bradway's ownership when determining the value of his interest, because tax shelters are designed to generate tax losses. As the partnerships mature, the concerns of the partners are more with the sales price. Gunkel's opinion is borne out by the record. Homestead gener-

---

[3]This partnership is also referred to as "Saulty Land...."

ated a $30,368 loss to Bradway in 1982 which the Liddles used to offset an equal amount of earned income. However, by 1985, this figure had decreased to $16,300, and by 1990 it would fall to $9,600. This supports Gunkel's conclusion that the partnership would probably sell the project within five to seven years.

Gunkel concluded that at the time of sale, which he felt would be at the end of 1990, Bradway's interest would sell for $100,000. However, as Cynthia argues, and Bradway and Gunkel agree, the trial court was required to value Bradway's interest in Homestead as of the date of the divorce — July 17, 1985. *Holbrook v. Holbrook,* 103 Wis. 2d 327, 334, 309 N.W.2d 343, 347 (Ct. App. 1981). "Fair market value" is the proper method of valuing property in a divorce property settlement. *Corliss v. Corliss,* 107 Wis. 2d 338, 345, 320 N.W.2d 219, 222 (Ct. App. 1982).

Fair market value is the price that property will bring when offered for sale by one who desires but is not obligated to sell and bought by one who is willing but not obligated to buy. *First Wisconsin Nat. Bank v. Wilson,* 121 Wis. 2d 505, 507–08, 360 N.W.2d 548, 550 (Ct. App. 1984). This definition requires consideration of what factors buyers and sellers find relevant when negotiating a deal. Thus, disadvantages or liabilities of ownership may dramatically affect the fair market value of property. *State ex rel. Wis. Edison Corp. v. Robertson,* 99 Wis. 2d 561, 569, 299 N.W.2d 626, 630 (Ct. App. 1980).

Gunkel's task was to determine the fair market value of Bradway's interest in Homestead at a time about halfway between its purchase and the probable sale of the partnership assets. *Holbrook* and *Corliss*

required Gunkel to consider what factors the hypothetical purchaser of Bradway's interest in Homestead would find relevant. Gunkel concluded that future cash to be distributed, loss allocation, tax benefits and price realized for the property would be the factors considered. He developed a table which showed the values of these items:

| Projected Date Received | Cash Distributed | Loss Allocation | Combined State and Federal 48% Tax Benefit | Terminal Value | Total Benefit |
|---|---|---|---|---|---|
| 12/31/85 | 1,380 | 16,300 | 7,824 | 0 | 9,204 |
| 12/31/86 | 990 | 14,700 | 7,056 | 0 | 8,046 |
| 12/31/87 | 990 | 13,200 | 6,336 | 0 | 7,326 |
| 12/31/88 | 990 | 11,900 | 5,712 | 0 | 6,702 |
| 12/31/89 | 990 | 10,700 | 5,136 | 0 | 6,126 |
| 12/31/90 | 990 | 9,600 | 4,608 | 100,000 | 105,598 |
| Total | 6,330 | 76,500 | 36,672 | 100,000 | 143,002 |

The total benefit to a purchaser of Bradway's interest in Homestead would be $143,002. However, there are disadvantages or liabilities connected with the purchase of Bradway's interest. The purchase would occur July 17, 1985, but the purchaser would not receive the total $143,002 until 1990. Because the value of a dollar to be received in the future is less than $1, Gunkel had to determine the present value of the $143,002. He calculated that value to be $64,578. However, because Bradway would pay capital gains taxes of $43,034 on that amount, Gunkel subtracted the capital gains tax from the selling price, and concluded that the fair market value of Bradway's interest in Homestead was $21,000.

Cynthia objects to Gunkel's reduction for future taxes, claiming that the taxes are hypothetical, speculative, imaginary, unfair and arbitrary. We disagree for two reasons.

First, Gunkel explained why he reduced values for future taxes. His explanation is reasonable. The reduction is therefore not arbitrary. The date of sale is not imaginary or hypothetical. Gunkel concluded that the probable sale would occur in five to seven years. His explanation was to the effect that this would occur because the investment would by then have lost desirability as a tax shelter, and his loss allocation calculations support this testimony.

Second, "speculation" is inherent in assigning values to future interests. We recognized this in *Selchert v. Selchert,* 90 Wis. 2d 1, 9, 280 N.W.2d 293, 297 (Ct. App. 1979) when we said: "If each payment would be taxed when received at approximately 10–20%, *which is reasonable speculation,* the present value of the pension would be ...." (Emphasis supplied.) Uncertainty has not prevented courts from valuing assets in divorce property settlements. A trial court must consider unvested pension benefits and future interests. Sec. 767.255(9), Stats.; *Leighton v. Leighton,* 81 Wis. 2d 620, 634–36, 261 N.W.2d 457, 463–64 (1978). To evaluate unvested pension benefits, an expert witness must assume, or speculate that among other possible factors, the pension owner will not quit his job or be fired and will live for a set time. The amount of the pension may be tied to the employer's future existence and profitability, and the pension plan may be terminated altogether. We see no practical difference between speculating about these

factors, and speculating that a real estate tax shelter will be sold when the tax benefits are depleted.

Cynthia argues that we prohibited discounts for future capital gains taxes in *In re Marriage of Ondrasek v. Ondrasek,* 126 Wis. 2d 469, 480–81, 377 N.W.2d 190, 194–95 (Ct. App. 1985). We do not read *Ondrasek* that expansively. The asset at issue in *Ondrasek* was a law office building, which the husband needed in his law practice. There was no evidence that the husband would not need office space for his law practice. Here, the evidence showed a probable sale in five to seven years. *Ondrasek* is not applicable here.

Cynthia also faults Gunkel's arithmetic, or method of calculating Bradway's interest in Homestead. However, she did not raise this issue in the trial court. Prior to Gunkel's testimony, her attorney said:

> I have examined Mr. Gunkel's appraisals, and I have no argument with the numbers that he comes up with, down to the point where he makes a reduction, or attempts to make a discount because Mr. Liddle does not own the majority of a particular entity, and he, then, attempts to make a deduction for capital gains and/or other taxes, assuming that Mr. Liddle would dispose of that. He, then, comes to the bottom-line figure.
>
> What I am suggesting is that I would stipulate to those numbers that he came up with, subject, obviously, to addressing, in my brief, the plethora of law, in Wisconsin, relating to divorces and as to the Court's ability to deduct taxes and/or minority interests, discount them, in these kinds of cases.

Consistent with this position, Cynthia did not cross-examine Gunkel. She has not included the parties' trial court briefs as part of the record.

141

As a general rule, we will not consider an issue raised for the first time on appeal. *Pabst Brewing Co. v. Milwaukee,* 125 Wis. 2d 437, 459–60, 373 N.W.2d 680, 691 (Ct. App. 1985). Had Cynthia pointed out Gunkel's alleged errors to the trial court, any problem that might have existed could easily have been solved then. We see no reason to depart from our general waiver rule.

Cynthia also contends the valuation of Twin Lakes limited partnership is speculative. She claims "Gunkel has assumed that this asset will be sold in 1985, but there is no evidence that such a sale was in fact imminent or that it in fact occurred." Again, she has overlooked evidence that the property will probably be sold. Under a heading entitled "probable continuation of partnership investment in current real estate holdings," Gunkel's analysis of Twin Lakes reads "Madsen Corporation, the general partner and manager, has programmed the sale of current investment property in 1985." The evidence supports this conclusion. By 1984, Bradway's yearly allocated loss had dropped to $3,425 from a high of $8,157 in 1980. He had recovered 104% of his original investment. We see no difference between Gunkel's analysis of Twin Lakes and his analysis of Homestead. The trial court could reasonably consider and adopt Gunkel's opinion that the value of the limited partnerships ought to be reduced by future capital gains taxes.

*General Partnerships — Reduction For Taxes*

Bradway is a partner in four general partnerships which own real estate. Cynthia points to Aardvark Investments to support her contention that the trial court erred by reducing Bradway's interest in Aardvark for future taxes.

Aardvark Investments owns four duplexes. It was organized in 1974 with two general partners, Bradway Liddle and R.F. Jenkins. Since 1974, Bradway has taken $27,184.50 in depreciation, which he has deducted from his and Cynthia's gross income for federal and state income tax purposes. The partnership paid $169,056 for the duplexes, which were appraised at $306,600 in 1985. After deducting for mortgage notes payable and accrued real estate taxes, Gunkel concluded that Bradway's equity in the property was $65,849. From this sum, Gunkel subtracted a discount of $13,170 for lack of control of the partnership, and $15,164 which represented Bradway's capital gains taxes if the property were sold. The resulting sum of $37,515 was Gunkel's opinion of the fair market value of Bradway's interest in Aardvark.

Cynthia agrees that the trial court was required to consider the tax consequences of its property division. Sec. 767.255(10), Stats. She argues, however, that any tax consequences resulting from Bradway's receipt of the general partnership are too speculative to be considered. She also relies upon *Ondrasek,* 126 Wis. 2d at 480–81, 377 N.W.2d at 194–95, for the proposition that a trial court may not consider future capital gains taxes when valuing an asset unless a sale is imminent.

We repeat what we have said about *Ondrasek* in our discussion of Bradway's limited partnerships. However, there was no testimony that the general partnerships were designed as tax shelters, with an intended time of sale.

In considering tax consequences of a divorce property settlement, the trial court is to use a "test of fairness." *Jost v. Jost,* 89 Wis. 2d 533, 542, 279 N.W.2d

202, 206–07 (1979). The inquiry is how the division works out in reality. An appellate court does not decide this question *de novo,* because we will not upset the valuation of marital assets unless clearly erroneous. *Weiss,* 122 Wis. 2d at 698, 365 N.W.2d at 613. We therefore consider whether enough evidence exists to permit the trial court to make its finding.

The trial court gave Cynthia cash. It adopted the parties' agreement that each party receive an equal amount of property. The general partnerships were not the equivalent of cash. They carried negative "baggage" with them: when sold, the owner would receive less than the difference between the sale price and the mortgage because of factors which originated during the marriage. The only way to avoid paying the taxes would be to die.[4]

The general partnerships were not items Bradway needed for his livelihood, like the law office in *Ondrasek.* As investments, they were only valuable as long as other investments were not more desirable. Bradway was forty-six years old at the time of the trial. The trial court would be entitled to conclude

---

[4]A seller of a partnership could offset the capital gains taxes realized by the sale by other methods, such as making charitable gifts, incurring business losses, or investing in property which immediately generates depreciation. These actions, however, necessarily occur after the seller is divorced, and may not be what he or she desires. Absent support or maintenance issues, or postponed payments on property settlements, a divorce terminates the financial ties of the marriage. An equal property division does not permit a post-divorce detriment to one party without a corresponding pre-divorce benefit.

Our discussion considers the situation of the parties prior to the enactment of the tax reform act of 1986.

that Bradway was more likely to sell his interest in the partnerships than to die owning them. It could conclude that it would be more likely than not that Bradway would incur a capital gains tax on the sale of the partnerships. It could therefore consider and adopt Gunkel's opinion that the fair market value of the general partnerships ought to be reduced by future capital gains taxes.

*Ondrasek* does not require a different result. In part, this is because a "test of fairness" is used in considering the tax consequences of a divorce property division. What a trial court finds "fair" under one set of circumstances, it might find unfair under different circumstances. The briefs in *Ondrasek* did not discuss the issue Bradway claims is most important here — that it is unfair that a married couple share tax benefits of an investment but that only one of them pays the capital gains taxes incurred when the investment is sold.[5]

*General Partnerships — Reduction For Lack Of Control*

The trial court adopted Gunkel's analysis of Bradway's less than total ownership of the general partnership assets. Gunkel explained that after calculating Bradway's equity in the partnerships, he re-

---

[5]While Bradway's contention is correct, he does not consider that marital assets were used to purchase the partnerships. The trial court could consider that Bradway earned the income used to buy the partnerships. However, it also had to consider Cynthia's monetary and non-monetary contributions to the marriage. It also was required to consider Bradway's non-monetary contributions, and other factors it found relevant, and then balance all factors to achieve a fair result.

duced the fair market value of that equity by a "discount for lack of control." He testified:

> The principal thing here, is whether or not Mr. Liddle has, within his own power, the right to make a decision to dispose of the property or continue its ownership, or to bring in a new investor, to, in some way or another, change his investment position.
>
> The percentages ... reflect what, in my opinion, it would take to attract someone into that position of lack of control.
>
> In my mind, it's obviously a far more encumbered ownership position than if the holder had full 100 percent ownership.

Gunkel's explanation was that there would be virtually no buyers for Bradway's interest outside of his other partners, and they may not be able to purchase Bradway's interest or want to do so. He came to his opinion from his experience in assisting in this type of transaction and reading.

Gunkel was required to use the definition of "fair market value" found in *First Wisconsin,* 121 Wis. 2d at 507–08, 360 N.W.2d at 550, and consider factors that a purchaser of Bradway's interest would find relevant. In *East Briar v. Rome Board of Review,* 113 Wis. 2d 33, 334 N.W.2d 692, (Ct. App. 1983), we considered restrictions on the sale of a golf course, dam and artificial lake to determine whether the restrictions would affect the fair market value of the real estate. We concluded that all factors which have a bearing on the value of property must be considered to determine its fair market value. *Id.* at 39, 334 N.W.2d at 695–96. Cynthia does not contend that a purchaser would not consider lack of control in a decision to purchase

Bradway's interest in the general partnerships, nor did she introduce testimony to that effect. She merely asserts that the fair market value of Bradway's interest is determined by subtracting liabilities from asset values. As we have explained, that method of evaluation ignores the factors a hypothetical purchaser would consider. It therefore may describe "value" but not "fair market value." We find no reason to upset Gunkel's deductions for lack of control.

*Stock Portfolio — Reduction For Taxes*

Bradway owns shares of stock in fourteen publicly-held corporations. An exhibit showed their purchase price, market price as of June 13, 1985, and "net." Gunkel explained that he arrived at the fair market value of the stocks by subtracting $14,650, the capital gains tax which would be paid upon sale of the stocks, from their market value, $95,649. Cynthia views the sale of the stock as imaginary and speculative, and contends that the trial court should have valued the stock at $95,649.

Gunkel's explanation of the reason he subtracted the taxes is similar to the reasons he gave for subtracting similar taxes to arrive at the fair market value of the general and limited partnerships. We need not examine his expert opinion that accounting practices require this deduction, and that from an economic and accounting practice, it is reasonable to deduct the taxes because we conclude that the evidence would support a finding that the stocks probably will be sold.

Bradway's balance sheet shows that his liquid assets consist of the stock, two certificates of deposit totaling $24,000, a $5,000 "Hy-Cite" note, insurance policies with a cash surrender value of $20,000 and a

$1,000 income tax refund. The trial court ordered Bradway to pay Cynthia $23,000 within thirty days, and five yearly installments of $18,000 with interest of twelve percent per annum. Bradway's budget, including state and federal income taxes, showed monthly expenses of $7,091, and his income, which the trial court found would not decrease substantially, had averaged $82,500 per year for the five years preceeding the divorce. Bradway was ordered to pay $9,000 per year child support for three years. Bradway's expenses therefore totalled $94,000 per year. The trial court could reasonably have found that Bradway would be unable to pay Cynthia her portion of the property settlement out of earned income, at least for two to three years.[6]

Bradway testified that he intended to contribute toward his daughter's education at the University of Wisconsin-Madison, commencing in a few months, though his attorney had explained to him that he could not include that item in his budget. In the next three years he would incur a budget deficit of about $30,000. Within five years he would be required to pay Cynthia $71,000 plus twelve percent interest on that sum.[7] The stock portfolio would bring $81,000 after capital gains taxes.

Stock, like Bradway's interest in the general partnership, is an investment. Accordingly, if a partic-

---

[6]Bradway testified that a $600 per month expense for legal and expert fees was the total amount owed amortized over two years.

[7]This figure assumes a simple interest rate of twelve percent. Compounding the interest would increase the amount due. The trial court's order reads only "The respondent shall also pay interest at the rate of 12% annually."

ular stock becomes less advantageous as an investment, it is likely to be sold and another stock purchased. The trial court could have concluded that Bradway was more likely to sell the stocks than to die owning them. It could have concluded that Bradway would be required to sell the stocks to educate his daughter, meet his budget deficits, and pay the balance of his property settlement. It could have concluded that even if Bradway received the $21,000 from a sale of his Twin Lakes limited partnership, and liquidated his certificates of deposit, that the stocks would be sold, and that Bradway would sell them rather than surrender his life insurance policies, sell his automobile and quit his job to obtain the proceeds of his retirement plan. The trial court could reasonably consider and adopt Gunkel's opinion that the value of the stock should be reduced by a future capital gains tax.

*Blanket Adoption of Gunkel's Valuations*

Cynthia contends that the trial court did not consider the reasoning or details of Gunkel's opinion, and therefore did not address Gunkel's improper assumptions. There are two answers to this contention. First, the trial court did consider Gunkel's opinion, at least as far as it was able, given no evidence casting doubt on those opinions. Second, our standard of review permits us to go behind the trial court's opinion where insufficient findings are made. We have done so, examined the evidence, and concluded that there is an adequate basis for the trial court's decision.

The trial court found that the valuation of assets includes a consideration of deferred liabilities. How-

ever, the court found that determining the amount of the deferred liabilities was difficult. It therefore relied upon Gunkel's expert opinions on the subject, and found his assumptions and predictions probably correct.[8]

Though the trial court might have gone further and examined Gunkel's reasoning, there is a limit to how far trial courts must go. Here, Cynthia chose not to provide the court with expert testimony contradicting Gunkel's conclusions. Nor did she cross-examine Gunkel to test his opinions. Trial judges need not become certified public accountants so as to be better able to understand tax accounting and theories of valuation of future interests. The duty of testing an expert's opinion is upon counsel, not the court. "Where the premises leading to the expert's conclusion are attacked as inadequate, it is the duty of opposing counsel to draw out the data that led to the expert's opinion." *Klingman v. Kruschke,* 115 Wis. 2d 124, 127, 339 N.W.2d 603, 604 (Ct. App. 1983).

Were we to adopt Cynthia's position that the trial court failed to make adequate findings, or failed to exercise its discretion, we would not automatically reverse the trial court's judgment. Insofar as the trial court's decision to believe and adopt Gunkel's reasoning was a discretionary act, we are to look for reasons to sustain the trial court. *In Matter of Adoption of R.P.R.,* 98 Wis. 2d 613, 619, 297 N.W.2d 833, 836 (1980). Even if the trial court abuses its discretion, reversal is not automatic. We are obliged to uphold a discretionary decision of a trial court if we can conclude, *ab initio,* "that there are facts of record

---

[8]The court accepted one of Gunkel's assumptions which increased Cynthia's property settlement by $15,000.

which would support the trial judge's decision had discretion been exercised on the basis of those facts." *Schmid v. Olsen,* 111 Wis. 2d 228, 237, 330 N.W.2d 547, 552 (1983). If the trial court's decision rests upon fact finding and we are confronted with inadequate facts, we may search the record and affirm if the trial court's conclusions are supported by evidence that is not clearly erroneous. *Guardianship & Protective Placement of Shaw,* 87 Wis. 2d 503, 518, 275 N.W.2d 143, 151 (Ct. App. 1979); *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983); *Dodge v. Carauna,* 127 Wis. 2d 62, 67, 377 N.W.2d 208, 211 (Ct. App. 1985).

We have done what is permitted or required by *R.P.R., Shaw* and *Schmid.* We have searched the record for facts and reasons which would support the trial court's decision to discount values for tax and control considerations. We have done so by following *Ondrasek,* though the arguments made here were not made in *Ondrasek,* and the cases we relied on in *Ondrasek* were decided before sec. 767.255(10), Stats., was enacted.[9]

Though we could remand for further factfinding, we do not do so because Cynthia argues that, as a matter of law, the facts brought out at trial do not permit the deductions made by Gunkel and the trial court. Further factfinding would not affect this issue. We affirm the trial court's property valuations.

## MAINTENANCE

Cynthia argues that the trial court abused its discretion by failing to explain why it denied her

---

[9]Section 767.255(10), Stats., necessarily requires some speculation as to future events.

maintenance, and by failing to award maintenance in some amount.

Cynthia agrees that an award of maintenance is discretionary, *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20–21 (1981). She argues that because a discretionary act must be the result of a rational mental process which demonstrates a consideration of the law and the facts of record, *id.,* the trial court's decision not to award maintenance must be set aside because the court did not explain the basis for its ruling.

Part of the difficultly with Cynthia's argument is that her focus on appeal is broader than her focus in the trial court. Though she has not included her trial court briefs in the record, the trial court's decision points out the reason Cynthia believed she was entitled to maintenance:

> The petitioner has also requested maintenance payments of $750.00 per month. The primary justification appears to be that the petitioner feels the payments are necessary to allow her to live in the manner the parties enjoyed during their 21-year marriage. The petitioner cites a desire to continue investing and saving money as an example of this accustomed lifestyle. As a result of the property division and the proceeds to be received as a result of the sale of the residence, the petitioner will enjoy at least a limited opportunity to invest and to save the resulting earnings of these investments. The petitioner has not requested maintenance payments as a means of helping her re-enter the job market, nor has she requested payments in compensation for helping finance the respondent's education. As a result, the Court concludes that maintenance payments are not warranted.

The trial court considered that Cynthia wanted to continue investing and saving money. It concluded that she would be able to do so with the proceeds of the property settlement it had ordered. We will examine this conclusion.

Cynthia was given one-half the value of the parties' home, with a stipulated full fair market value of $100,000, encumbered with a mortgage of $15,964.51. Just prior to the trial court's decision, the home was sold.

To close the sale, Cynthia and Bradway stipulated that she would receive the home as part of the property division. She therefore had $84,035.49 available for investing, though she testified that she wished to buy a home in the $75,000 to $85,000 price range. If she did so, the $241.57 mortgage payment, and some portion of the property tax and house maintenance amounts included in her budget would be available for investments. In addition, she would receive an additional $71,000 plus twelve percent interest, albeit over a five-year period, which she could use for investments.[10]

The trial court therefore had a basis in the record for its conclusion that the parties' property settlement would permit Cynthia to have investments, though not as substantial as the parties enjoyed during the

---

[10]The trial court's valuation of the marital estate did not include the parties' home, because they had agreed that the home would be sold, and the net proceeds divided. After trial, the parties stipulated that Cynthia would receive the home, which they valued at $84,035.49 net. Cynthia therefore received a total property settlement of $154,736.46. The effect of the stipulation was that Cynthia received her half of the $84,035.49 and also received Bradway's half which was applied to the $112,718.71 Bradway had been ordered to pay as a property settlement.

153

marriage. Though Cynthia asserts that she wants to use her early property settlement payments to purchase a house, that is her choice. Both parties were free to use their post-divorce assets as they saw fit.

The trial court considered Cynthia's asserted reasons for seeking maintenance, and concluded she would receive what she wanted without maintenance. It did not abuse its discretion by failing to consider other, non-asserted reasons why Cynthia should receive maintenance. *See McClelland v. State,* 84 Wis. 2d 145, 157–58, 267 N.W.2d 843, 848–49 (1978). (Failure to ask the trial court to exercise discretion to exclude evidence precludes appellate assertion that the trial court erred by failing to exclude evidence.)

Cynthia now claims she needs maintenance to meet her basic necessities, and that the trial court erred by not considering Bradway's ability to pay for her needs. Had this argument been made to the trial court, we could now review its decision. We do not consider issues raised for the first time on appeal. *Pabst Brewing Co.,* 125 Wis. 2d at 459–60, 373 N.W.2d at 691.[11]

---

[11]Though we conclude that Cynthia has waived a review of this issue, Cynthia's budget and Bradway's testimony provide a basis for the trial court's denial of maintenance had need been asserted at trial. Cynthia's budget totalled $2,368.57 per month. Bradway testified that he had used Cynthia's cancelled checks to determine what she had spent on the items she listed in her budget, and that her budget was inflated by $227.76 per month. From this, the trial court could have found Cynthia's needs to be $2,140.81 per month. It ordered support of $750 per month, which when added to her net income of $1,400 per month, gives her $2,150 per month. This does not take into consideration that Cynthia has included $75.00 a month as a payment toward

Insofar as Cynthia is arguing that the trial court was required to award maintenance because the parties were married for twenty-one years, Bradway earns $86,000 per year while she earns $23,760 per year, and they had a comfortable lifestyle, she misperceives our standard of review. Those factors, among others found in sec. 767.26, Stats.,[12] are factors trial

---

estimated income taxes but has not included the investment interest which would produce the taxes in the computation of her monthly income.

[12]Section 767.26, Stats., provides:

Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(g) or (j), the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time after considering:

(1)  The length of the marriage.

(2)  The age and physical and emotional health of the parties.

(3)  The division of property made under s. 767.255.

(4)  The educational level of each party at the time of marriage and at the time the action is commenced.

(5)  The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(6)  The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

(7)  The tax consequences to each party.

(8)  Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, where such repayment has not been made, or any mutual agreement made by the parties before or during the marriage

courts are to consider if the parties request that consideration. The trial court acknowledged the parties twenty-one-year marriage, their incomes, and their lifestyle. The trial court is not required to consider all the factors listed in sec. 767.26, Stats. — only those that are relevant. *In re Marriage of Trattles v. Trattles,* 126 Wis. 2d 219, 228–29, 376 N.W.2d 379, 384 (Ct. App. 1985). The authority Cynthia cites requires only reasoned decisionmaking, not a particular result. The *Hartung* court explained:

> It is recognized that a trial court in an exercise of its discretion may reasonably reach a conclusion which another judge or another court may not reach, but it must be a decision which a reasonable judge or court could arrive at by the consideration of the relevant law, the facts, and a process of logical reasoning.

*Id.,* 102 Wis. 2d at 66, 306 N.W.2d at 20–21.

The trial court rationally considered Cynthia's requests. It considered relevant factors from sec. 767.26, Stats. It arrived at a decision which a reasonable judge could reach. Appellate inquiry ends here.

*By the Court.*—Judgment affirmed.

concerning any arrangement for the financial support of the parties.

(9) The contribution by one party to the education, training or increased earning power of the other.

(10) Such other factors as the court may in each individual case determine to be relevant.