WHITECAPS HOMES, INC., a Wisconsin corporation,
Petitioner-Appellant,

v.

KENOSHA COUNTY BOARD OF REVIEW, Respondent-
Respondent.

Court of Appeals

*No. 96–1913. Submitted on briefs March 21, 1997.—Decided
August 6, 1997.*

(Also reported in 569 N.W.2d 714.)

714

715

716

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Micheal D. Bannon* of *DeMark, Kolbe & Brodek, S.C.* of Racine.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Donald E. Mayew* of *Phillips, Richards, Mayew & Corrigall, S.C.* of Kenosha.

Before Snyder, P.J., Brown and Anderson, JJ.

SNYDER, P.J. Whitecaps Homes, Inc. (Whitecaps) appeals from a judgment by the circuit court of Kenosha county which affirmed a decision by the Kenosha County Board of Review on assessments of individual, subdivided pieces of property owned by Whitecaps. *See* § 70.47(13), STATS. The action originated with an appeal regarding the 1994 Kenosha county assessor's valuation of individual lots that were

part of a parcel owned and developed by Whitecaps. In reviewing the original assessments, the Board did not fully adopt the position of either the county assessor or Whitecaps. From the Board's decision, Whitecaps filed a writ of certiorari with the circuit court. *See id.* The circuit court upheld the Board's findings.

Whitecaps claims that: (1) the Board's assessment is without evidentiary support in the record; (2) the Board ignored evidence of a recent arm's-length transaction of the land; and (3) the actions of the Board were arbitrary, oppressive and unreasonable and represented its will and not its judgment. We conclude that the Board properly reached its decision and therefore affirm.

Whitecaps buys large tracts of undeveloped land and develops and subdivides the land for residential home buyers. Included in this process are improvements to the land to prepare it for residential use, such as grading, water and sewer lines, and roadways. Whitecaps does not sell individual undeveloped lots; rather, the land sale is included as part of a "home package," which includes the construction of a selected model home.

Whitecaps' assessment includes four different types of lots: (1) platted, unimproved lots; (2) platted, improved lots; (3) platted, improved lots with partially constructed homes; and (4) outlots.[1] Whitecaps does not appeal the assessments on the outlots.

The Board heard the testimony of Rocco Vita, a Kenosha county assessor. For lots which were platted but unimproved, he testified that the "front foot" method was utilized in determining value; because these lots had not been improved, the value arrived at

---

[1] An outlot, according to the record, is a "non-buildable retention area[ ] in the subdivision to control drainage."

was then reduced by 50%. He testified that this same method was used to arrive at the values for the platted, improved lots, but without the 50% reducing factor. In utilizing this method the assessor also included adjustments for any irregularly shaped lots. For lots that included partial construction, Vita testified that the assessment was based on assigning a value to the lot itself, utilizing the above methodology, and then factoring in a fair market value for the home. The fair market value was arrived at by determining a value for the home upon completion and then multiplying that number by the percentage of completion.

Michael Pitts, a state certified real estate appraiser, testified on behalf of Whitecaps. He presented the "square foot" method as the proper means of assessment in this case. This method relies on the number of square feet in a given lot which is then multiplied by a price per square foot.[2] Both Vita's and Pitts' approaches to land valuation are recognized as proper. *See* 1 PROPERTY ASSESSMENT MANUAL FOR WISCONSIN ASSESSORS, Part I at 8–2 (1997).

After hearing the conflicting testimony of the county assessor and Whitecaps' expert, the Board reduced the value of the unimproved lots to $10,000 per lot and decreased the assessed values of the improved lots by 3% each. The Board accepted Kenosha county's assessments as they related to the partially constructed homes and accepted the assessor's

---

[2] Pitts also disputed Vita's "fair market" approach to assessing the partially constructed homes and instead claimed that those assessments should be based on a "cost of replacement materials" method. However, Whitecaps does not appeal the assessments of the partially constructed homes, only the assessed values of the lots on which they sit.

valuation of the outlots. Circuit court review affirmed the Board's actions. Whitecaps now appeals.

The scope of this court's review is identical to that of the circuit court; our review is independent and does not rely on the circuit court's conclusions. *See Steenburg v. Town of Oakfield,* 167 Wis. 2d 566, 571, 482 N.W.2d 326, 327 (1992). In determining whether a valuation has been made upon the statutory basis, a court adheres to a number of principles. *See id.* at 571, 482 N.W.2d at 328. The court must consider: " '(1) [w]hether the board kept within its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question.' " *Metropolitan Holding Co. v. Board of Review,* 173 Wis. 2d 626, 630, 495 N.W.2d 314, 316 (1993) (quoted source omitted). If there is conflicting testimony concerning the value of the property, the court will not substitute its opinion for that of the board. *See Steenburg,* 167 Wis. 2d at 572, 482 N.W.2d at 328. The valuation must be upheld if there is credible evidence before the board which in any reasonable view supports the valuation. *See id.*

*Platted and Improved Lots*

We begin our analysis with the method of land valuation utilized for the platted and improved lots. Some of these had partially constructed homes on them; others were awaiting the start of construction. We initially direct our attention to the means of valuing the lots themselves. The Board heard testimony from two experts who explained the use of

two different methods of land valuation—the "front foot" method and the "square foot" method. While both methods are acceptable, the 1 PROPERTY ASSESSMENT MANUAL, Part I at 8–2 states that "[t]he front foot is generally used . . . in built up areas where the lots are relatively small." In contrast, the manual states that "[t]he square foot is an appropriate unit of comparison in areas where the lots are irregularly shaped and where frontage is not the primary factor contributing to the value of the site." *Id.* The manual goes on to describe how this valuation is particularly useful in areas of excessively large lots because the excess amount of land, beyond the standard-sized lot, will generally sell for less per square foot than the rest of the lot. *See id.* We note that the Whitecaps development is in a densely built up area, and that the lots range in size from 6900 to 8050 square feet, which is relatively small.

Vita testified that he had used 95 comparable lot sales from other subdivisions in order to arrive at his valuation of $425 per front foot for the Whitecaps development. He noted that he used sales that had occurred within the Whitecaps development, but also from other subdivisions which he considered to be comparable. He testified that some of his comparables were taken from another subdivision, with lot sizes ranging from 60 to 67 feet wide and 125 to 130 feet deep. In analyzing those sales, he determined that comparable lots were selling for a price of between $417 to $500 per front foot. He also noted that when sales of completed homes within the comparable subdivision were compared to sales of Whitecaps homes, the Whitecaps average of $149,000 was very close to the average sale price of $141,600 in the comparable subdivision.

Whitecaps' expert submitted his own list of "comparable" lots. However, Vita demonstrated that a number of these were from subdivisions in which the lot sizes ranged from 13,000 to 18,000 square feet, which were more than twice the size of the lots in the Whitecaps subdivision.

The Board was presented with the county assessor's valuation, using the front foot method, as approximately $425 per front foot,[3] and ample testimony supporting the assessor's methodology. Furthermore, Vita demonstrated certain perceived inadequacies in the alternate method Whitecaps' expert offered. Although the Board accepted the methodology employed by Vita, it nonetheless reduced the value of each lot by 3%. In essence, this was a reduction of approximately $12.75 per front foot. While this was still higher than the proposed valuation of Whitecaps' expert, it was lower than the valuation originally made by the county assessor.

Whitecaps argues that this "blanket reduction" of 3% suggests that the Board's action was arbitrary and not supported by the evidence. However, Vita's testimony made it clear that although many of the lots

---

[3] The county assessor had placed assessed values on the lots which ranged from $24,100 to $33,400. However, most of the lots were valued as follows:

| | |
|---|---|
| 60' x 115' | $24,100 |
| 65' x 115' | $27,100 |
| 70' x 115' | $29,200 |

were valued the same, based on size and similarity,[4] the county assessor had also undertaken to individually value those lots which varied from a standard lot. For the Board to choose an across-the-board reduction in such an instance is not arbitrary when the lots in a development are so similarly situated and it is apparent that the assessor's initial valuation considered those lots which presented unique characteristics. We can discern no error in the Board's action. While the Board was presented with credible evidence to support the initial assessments, it was also presented with evidence as to a range of assessed front foot values on other lots in the county. Its decision to reduce the overall land assessments by some percentage was a proper exercise of its discretion. A court will review the evidence only to ascertain if there is reasonable grounds for a belief that the decision is the result of honest judgment. *See State ex rel. N.C. Foster Lumber Co. v. Williams,* 123 Wis. 61, 65, 100 N.W. 1048, 1049 (1904).

Whitecaps also argues that the Board erred in its adjusted valuation for the developed parcels on another basis. Whitecaps directs this court to the testimony of its own vice president of sales, Virginia Wolfe, who testified that she "tracked both the cost and profit of homes and lots sold with each home package." Based on those figures, she concluded that the actual sale price of lots ranged from a low of $20,648 to a high of $24,089. Whitecaps contends that these figures represent "arm's-length sales" of the disputed properties, and that this represents the "best information" with which to determine fair market

---

[4] Because the Whitecaps development lies on an area that was originally farmland, very few of the lots are irregularly shaped.

value. *See* 1 PROPERTY ASSESSMENT MANUAL, Part I at 7–3.

■ We are not persuaded that the value assigned to each lot by a developer who sells only home packages must necessarily be considered comparable to an arm's-length sale. A developer may have varied reasons for assigning a certain amount of profit to the lot portion of a sale as opposed to the profit from the home construction. The Board did not err in not considering this evidence as necessarily the best information available.

## Platted and Unimproved Lots

Whitecaps next contests the Board's reduction of the assessed value of 15 unimproved lots from the county assessor's valuations which ranged from $13,500 to $24,200 per lot to a flat per lot assessed value of $10,000. Whitecaps argues that because "nothing in the County's presentation set a value, or even hinted at a value of $10,000 per lot," this fact alone suggests that this was an arbitrary reduction on the part of the Board.

The Board heard testimony from Vita that "there probably isn't a fast standard that you'll find anywhere on how to provide value to a parcel in which there still is a right to develop but that a lot of the improvements have yet to be made. So what we tend to rely on is experience." Vita then offered an explanation of how he had arrived at the values for the undeveloped lots. He testified that he used the same $425 front foot value that was utilized for the developed lots, but then used "a negative adjustment of 50 percent or just a 50 percent residual." The result of this calculation is that if a parcel would have a value of $30,000 when it is

improved, the value for the parcel in its undeveloped state would be calculated as $15,000. He also admitted that because Whitecaps does not sell individual parcels, but rather home packages, he "[did not] have the luxury of having vacant sales occurring within the development."

Whitecaps countered this with the testimony of Wolfe. She testified that the original acreage constituting the parcels in question had been purchased at a cost of $13,398 per acre. The total acreage purchased was yielding 3.4 to 3.5 lots per acre, which established a per lot cost of $4098.

Whitecaps also offered evidence that a sale of unimproved vacant lots had occurred in another subdivision which Whitecaps considered to be comparable to its development in which 16 unimproved lots were sold at a price of $7800 per lot. While Vita contended that this was not "a sale of property" because the transfer was between two business entities owned by the same sole shareholder, and therefore he did not consider this an arm's-length transaction, the evidence of this significantly lower value was also placed before the Board.

Given the conflicting testimony of Vita and Whitecaps with regard to the proper assessment of the unimproved lots, it is apparent from the record before us that the Board concluded that there was substantial evidence to suggest that the assessed value for the unimproved land lay between the county's assessment and the much lower value claimed by the taxpayer. The substantial evidence test is highly deferential to the board's findings, and if any reasonable view of the evidence will sustain those findings, they are conclusive. *See Clark v. Waupaca County Bd. of*

*Adjustment,* 186 Wis. 2d 300, 304–05, 519 N.W.2d 782, 784 (Ct. App. 1994). Having already heard testimony about how similar one lot is to another in the Whitecaps development, it was not unreasonable for the Board to determine that a flat assessment for all unimproved parcels was fair. That determination, coupled with the countervailing evidence the Board had heard from both sides, leads us to conclude that the evidence before the Board provided a "substantial basis" for the Board's decision to reject the assessor's methodology and utilize a flat assessment value for these lots. *See N.C. Foster Lumber Co.,* 123 Wis. at 65, 100 N.W. at 1049.

### *Platted and Improved Lots with Partially Completed Homes*

■ Whitecaps also contests the 3% reduction it was awarded on the lots that already had partially constructed homes on them. Its objection is that "the value of the land was over assessed in the same manner as described above." On these lots, the Board reduced the land value in keeping with its previous reduction of value on the developed lots, but affirmed the assessor's value of the improvements to the individual lots (i.e., the partial construction). Whitecaps does not contest the affirmance of the assessor's valuation of the improvements. Because we conclude that the Board's 3% reduction of the assessor's valuation of the land was supported by substantial evidence, we adopt that same analysis in affirming the reductions on the lots that contained partially completed homes.

In its appeal to the circuit court, Whitecaps included an affidavit of one of the Kenosha County Board of Review members and argued that it provided further evidence of "[a] lack of good faith" on the part of the Board. As the circuit court correctly determined and as Whitecaps concedes, "[w]e review the same record made before the board of review." *State ex rel. Wis. River Power Co. v. Board of Review,* 125 Wis. 2d 94, 97, 370 N.W.2d 580, 582 (Ct. App. 1985). The affidavit was not part of the original record before the Board and thus is not part of the record before this court.

In sum, we conclude that the Board acted within its authority in its review of the Whitecaps assessments. Whitecaps has presented no evidence to substantiate its claims that the Board's actions were arbitrary and not based upon information it had before it. There was substantial evidence presented at the three hearings the Board conducted to allow Whitecaps to contest its assessments. The county assessor presented substantial credible evidence to support the values assigned to the various lots. Whitecaps presented convincing countervailing evidence in support of its position that the land assessments were too high. The reductions afforded Whitecaps were supported by the evidence the Board had before it. Courts may not reverse a board decision if it can be supported by any reasonable view of the evidence. *See State ex rel. Geipel v. City of Milwaukee,* 68 Wis. 2d 726, 732, 229 N.W.2d 585, 588 (1975).

*By the Court.*—Judgment affirmed.