GUNDRUM, J.
*164 ¶ 1 The Peter Ogden Family Trust of 2008 and The Therese A. Mahoney-Ogden Family Trust of 2008 (collectively "the Trust") filed this action for certiorari review of a decision of the Board of Review for the Town of Delafield sustaining the 2016 property tax assessment of the Trust's real property. The Trust argues the Board failed to act according to law when it sustained the assessment, which was based upon the assessor's change in the classification of the property from agricultural and agricultural forest to residential. Specifically, the Trust claims the classification change was erroneous because it was based upon the assessor's and the Board's mistaken legal belief that in order for land to qualify as agricultural land, crops grown on the property must be grown for a business purpose. Because we agree that both the assessor's change of the classification to residential and the Board's sustainment of that change were based upon the erroneous legal belief that a business purpose was necessary for an agricultural classification, we reverse and remand this matter to the circuit court.
Background
¶ 2 In April 2003, Peter Ogden and Theresa Mahoney-Ogden purchased the *655 land at issue in this *165 case. At the time, the land was classified as residential for property tax purposes, and it remained so classified until 2012, when the assessor changed the classification to agricultural and agricultural forest based upon pine trees, apple trees, and hay the Ogdens planted on the property. In 2016, the assessor reclassified the property as residential after concluding that it failed to qualify for the agricultural and agricultural forest classifications. If the property had remained classified as agricultural and agricultural forest, it would have been valued at $17,100, whereas it was valued at $886,000 when reclassified as residential-resulting in a significant difference in property tax owed.
¶ 3 The Trust objected to the 2016 property tax assessment, challenging the reclassification of the property to residential. The Board of Review held an evidentiary hearing. After hearing testimony and receiving exhibits, two members of the Board voted to sustain the residential reclassification and related tax assessment and two members voted to not sustain. Because the vote was tied, the assessor's reclassification of the property and the assessment were sustained. The Trust sought certiorari review and the circuit court upheld the Board's decision. The Trust appeals.
Discussion
¶ 4 On certiorari, we review the actions of the Board, not the circuit court. Fee v. Board of Review of Florence , 2003 WI App 17, ¶ 11, 259 Wis. 2d 868, 657 N.W.2d 112 (2002). Our review is limited to whether the Board (1) kept within its jurisdiction; (2) acted according to law; (3) acted arbitrarily, oppressively, or *166 unreasonably; and (4) supported its decision with substantial evidence. Whitecaps Homes, Inc. v. Kenosha Cty. Bd. of Review , 212 Wis. 2d 714, 720, 569 N.W.2d 714 (Ct. App. 1997). At issue in this case is whether the Board acted according to law, which is a question of law we review de novo. Lloyd v. Board of Review of Stoughton , 179 Wis. 2d 33, 36, 505 N.W.2d 465 (Ct. App. 1993). Resolving this question requires us to interpret our statutes and administrative rules, which are also matters of law we review independently. State v. Jensen , 2010 WI 38, ¶ 8, 324 Wis. 2d 586, 782 N.W.2d 415 (statutory interpretation); Orion Flight Servs. v. Basler Flight Serv. , 2006 WI 51, ¶ 18, 290 Wis. 2d 421, 714 N.W.2d 130 (administrative rule interpretation). Because we agree with the Trust that the Board failed to act according to law in sustaining the reclassification, and thus the assessment, of the property, we reverse.
¶ 5 When a taxpayer appeals an assessor's valuation to a board of review, the board presumes the valuation is correct; however, this presumption may be rebutted by a proper showing by the taxpayer that it is incorrect. Anic v. Board of Review of Wilson , 2008 WI App 71, ¶ 10, 311 Wis. 2d 701, 751 N.W.2d 870 ; see also WIS. STAT. § 70.47(8)(i) (2015-16).[1] The presumption of correctness, however, "presuppose[s] the method of evaluation is in accordance with the statutes." State ex. rel. Markarian v. City of Cudahy , 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970). "Errors of law should be corrected by the court on certiorari and the failure to make an assessment on the statutory basis is *167 an error of law." Id. If we "find[ ] upon the undisputed evidence before the board that the assessment has not been fixed upon the *656 statutory basis, the assessment should be set aside." State ex. rel. Boostrom v. Board of Review of Linn , 42 Wis. 2d 149, 156, 166 N.W.2d 184 (1969) ; see also State v. Town of Mosel , 32 Wis. 2d 253, 262-63, 145 N.W.2d 129 (1966) (determining that an assessment "was not made on the statutory basis" in part because "the board of review drew the unwarranted conclusion that the assessors had proceeded according to the methods permissible under the statute").
¶ 6 "[L]and ... that is devoted primarily to agricultural use" is "[a]gricultural land," WIS. STAT. § 70.32(2)(c)1g., and such land "must be classified as agricultural," Fee , 259 Wis. 2d 868, ¶ 12, 657 N.W.2d 112. See also WIS. ADMIN. CODE § TAX 18.06(1) (June 2015) ("An assessor shall classify as agricultural land devoted primarily to agricultural use." (emphasis added) ). "Agricultural use" "means agricultural use as defined by the department of revenue by rule and includes the growing of short rotation woody crops, including poplars and willows, using agronomic practices." WIS. STAT. § 70.32(2)(c)1i. (emphasis added). WISCONSIN ADMIN. CODE § TAX 18.05(1) (June 2015), a Department of Revenue rule, defines "agricultural use" as including:
(a) Activities included in subsector 111 Crop Production, set forth in the North American Industry Classification System (NAICS), United States, 1997, published by the executive officer of the president, U.S. officer of management and budget[ or]
....
(c)Growing Christmas trees or ginseng. (Emphasis added.)
*168 "Activities" "included in subsector 111 Crop Production," include the "growing" of apples and hay. See North American Industry Classification System (NAICS), United States, 1997, published by the office of the President, U.S. Office of Management and Budget, subsector 111 Crop Production. Of great import to this case, the plain language of the statute and rule refers to "growing" the relevant crops-here apples, hay, and Christmas trees-not marketing, selling, or profiting from them.
¶ 7 The Board acknowledges in passing the key "growing" language, stating that the Board "does not dispute that pursuant to these statutes and rules, the growing of alfalfa hay, Christmas trees, or apples may constitute an 'agricultural use.' " (Emphasis added.) Subsequently, however, the Board reasserts its position that land cannot be "devoted primarily to agricultural use" without "minimal sales," "valid economic activity," and crops being "marketed for sale." The Board cites to no statute, administrative rule, or case law in support of this position. We are not surprised because, as indicated above, according to the plain language of the relevant statute and administrative rule, the Board's position is not the law.
¶ 8 Based upon the above-identified statutory and regulatory provisions, we conclude that to qualify for the agricultural classification, it is sufficient that the land be devoted primarily to growing qualifying crops, whether or not those crops are grown for a business purpose. And, consistent with our case law and WIS. ADMIN. CODE § TAX 18.06(1) (June 2015), if the land is thus devoted primarily to agricultural use, it must be classified as agricultural.
*169 ¶ 9 On appeal, the Trust maintains that the Board failed to act in accordance with the law because the assessor's reclassification of the property to residential and the Board's sustainment of that reclassification were based on the assessor's and the Board's erroneous legal belief that to qualify for the agricultural classification, the land must be farmed for a business *657 purpose. The Board disputes this, asserting that "[i]t is clear the assessor did not impose a 'business' standard on the [Trust] when evaluating the extent of use of the property." Review of the transcript of the Board hearing, however, reveals that it is "clear" that the property was reclassified as residential based upon the assessor's and the Board's erroneous belief that the land did not qualify for the agricultural classification because the crops at issue were not being grown for a business purpose.
¶ 10 As part of his testimony before the Board, Peter Ogden read a memo from his legal counsel's office which indicated that for agricultural classification the property needed to be producing crops for a business purpose.[2] Ogden testified to planting and growing pine and apple trees on the property with the intent of eventually selling the pines as Christmas trees and selling the apples produced by his "orchard." He also testified to the "hay field" he and Lloyd Williams, a local farmer, seeded and harvested on the property, as well as a contractual arrangement he had with Williams related to this. Ogden explained that the apple trees were on the smaller of the two lots, *170 comprising "at best" an acre of the 4.6 acre lot, and the hay field and "Christmas tree farm" were on the larger 7.76 acre lot. Ogden indicated he harvests "three plus acres" of hay on the latter lot and the "Christmas tree farm" comprises "four to five acres."
¶ 11 Responding to questioning from the assessor as to whether he had "filed a Schedule F, profit or loss from farming," Ogden indicated he had not. Billy Cooley, one of the two Board members who voted to sustain the assessor's residential reclassification, also asked Ogden: "You did not file a Schedule F, which I am assuming is farm-inaudible. It was not brought up by your accountant or anything; correct?" Ogden responded: "To my knowledge I am not required to file a Schedule F." Larry Krause, the other Board member who voted to sustain the reclassification to residential, asked Ogden if Williams leased the hay acreage from him.
¶ 12 Counsel for the Board asked Ogden: "What is your business plan?" Ogden explained his plan of selling apples once the orchard had sufficiently matured, cutting the hay for Williams to use until Ogden "g[o]t cattle" as he explained was his future intent, and having individuals cut their own Christmas trees for a price and "then in the spring, we would replant where that stump is." When asked by counsel how he planned to advertise and market the Christmas trees and apples, Ogden discussed possible strategies. When asked by counsel "[w]hat kind of revenue" he expected, Ogden indicated he "hoped" he would "get somewhere between $65 and $75 a tree" for Christmas trees and approximately "$2.99 a pound" for the apples. Counsel continued to press Ogden for his "revenue projections" and "revenue calculations," to which Ogden explained his expectations.
*171 ¶ 13 Williams testified to farming Ogden's hay field since 2012. "We have plowed it. We tilled it." When questioned by the assessor, Williams confirmed that he agreed with a letter of Williams' dated three days earlier, which was admitted as evidence at the hearing and which stated: "In 2012, we seeded alfalfa and brome grass and used it for cattle feed. We have established a beautiful hay field that we have continually harvested every year. We will again be harvesting the hay crop in *658 2016...." Williams further testified that the land has "extremely good soil. We fertilize it properly. We maintain it." He anticipated "get[ting] 450 bales of first crop hay" off of the three acres of hay field on the land.
¶ 14 In his testimony before the Board, the assessor explained the basis for his determination that the property was no longer entitled to the agricultural classification:
Now, the issue is that the Ogdens may say well, they have a tree orchard and they are doing it for ag use. I can't really substantiate ... whether Terry [Mahoney-Ogden, Peter Ogden's wife,] is doing it for personal or ... for actual agricultural economic benefit , I can't determine that. And that is why I am seeking and have asked for all of this documentation because-and the same goes for ... the Christmas tree farm ....
....
Now, and actually I did not think at the very getgo that actually there would be any issue until I took a closer look at the information that was provided to me from Peter and Terry. And I mean there is lawn service. There is handyman. Things aren't split out. There is [sic] personal checks. There is [sic] checks from the tree farm. And I actually kind of was hoping *172 that when I looked at everything all of the expenses just flowed through the tree farm. Now, I am, okay, looking at this and going, okay, does the property taxpayer carry on an activity like a business. Because that is what ag use is about. Ag use is really for farmers; right? It is about farming.
And so, given that the physical evidence for me was difficult to substantiate, I went to documentation. And I mean, if you are going to be in ag use , I think you should be held to the same standards as the farmers are held to. And I am sure that Lloyd [Williams] files ... a Schedule F profit and loss . And I mean if I were running a business, I would ....
....
[T]here should be a relationship between Peter and Lloyd because they're [sic] supposed to be a transaction going on, per the contract.... I guess I was just looking for things to be much more clear-cut, everything flowing through because Peter had set up this tree farm account.... I went through and I looked at the receipts and I tabulated the number of trees that the receipts were in there for. And I mean, again, and if you are doing ag use, you're doing this to generate an income ....
Well, if you are going to be in ag use, you're going to be in business ....
I expected as a business person as somebody in ag use to be on top of it....
....
And when I looked at the documentation, I just did not get a good feeling. Me professionally that if somebody looked behind me that they would look at this and they would question whether this tree farm was being done *173 actually for agricultural reasons, to generate a profit for business , or was it being done to obtain significant property tax savings.... (Emphasis added.)
¶ 15 When Ogden questioned the assessor, the following exchange took place:
[Ogden]: So, yes, some of those checks that were in [documentation the Ogdens provided to the assessor] were written to other people. That doesn't negate the fact, does it, that we used the land for agriculture use; does it?
*659 [Assessor]: Well, I guess it makes me question whether it's personal or business .
[Ogden]: I understand your questioning. That is what you said today. I am asking you the question-So my accounting is sloppy. But, you were given the opportunity to look at the land and see that it was being farmed or trees were growing; did you not?
[Assessor]: I knew there were trees growing .... I don't deny I knew there were trees growing.
....
[Ogden]: ... [M]y point that I am trying to make to you is, we have land that we are farming. You have seen that; correct?
[Assessor]: I have seen land that you planted things on, yes . (Emphasis added.)
The assessor added: "I mean I have never physically been there to see Lloyd [Williams cut the hay field]. I have two different contracts. I don't see any transition [sic] neither of you can prove there was any money going back and forth when there was supposed to be in the contract." Upon further questioning by Ogden, the assessor admitted he "saw the apple trees" Ogden had *174 planted on the land, but stated that he "can't say it's done for ag use or for personal reasons."
¶ 16 The assessor acknowledged that Ogden offered him an opportunity to walk through the area of the property where the trees were planted but he chose not to do so "[b]ecause walking through the tree farm, if you want to classify it as tree farm or classify it as trees planted, it wasn't going to do me any good as far as substantiating any physical evidence." He stated the same reason applied to his declining to view the apple orchard. He added, "I originally had been out, you know, when I established the ag use with [Ogden]. And that is why I just-I didn't-I was looking at documentation now." When questioned by a Board member and counsel for the Board about whether, based upon aerial photos, the wooded area was "roughly" the same as when the land was designated as residential back in 2011, the assessor indicated the wooded areas were approximately the same but recognized that in the meantime "there was a planting of the orchard and the Christmas trees and the-," at which point counsel cut off the assessor, stating "I understand. I don't have anything further." The assessor acknowledged that the trees were not "scattered," but were planted "in clean rows" and were "staked out," as the assessor had previously explained to Ogden that Ogden would want to do in order to "do it right" for agricultural classification. The assessor stood by his decision to change the classification of the land from agricultural and agricultural forest to residential, emphasizing that he did not believe it was "ag use land" "based on the documentation."
¶ 17 In his closing remarks to the Board, the assessor stated:
*175 You know, unfortunately, the ag use program you would think it was really developed for the farmers. In reality there are so many loop holes that people can take advantage. If you truly knew what went on, you would shake your head.... [I]n summary, I just am going to go back to ag use is for farmers. Ag use is for business . Okay. If you want to get into it, okay, then you need to show that you are going to actually be doing a business . Okay. And I guess business-practice wise , agronomic which actually is the practice of, you know, doing a farm. I just didn't see it there . And again, I couldn't substantiate through the receipts that , I mean, the orchard was actually a business .... I mean, I could plant an orchard myself. I can *660 plant trees myself. And, I suppose I could say it was ag use. But, you know, if I were going to do it as a businessman and, Mr. Ogden, he's a businessman, make no doubt about it, well, I can tell you on my tax form I am taking okay, that farm loss off Schedule F. Okay.... And if I were going to take my business serious, I am going to let my accountant know what I am doing. So, all things to me just do not seem to be a business. It seems to be an effort to make it look like a business. That is my professional opinion.... I just couldn't substantiate once again so I had to go back to the documentation because I didn't feel there was physical evidence besides, yeah, there were trees planted. I can't deny that. But, you know that is the most that I could substantiate .
I gave the ... Ogden[s] the benefit of the doubt because I let them in the ag program.... The Ogdens simply didn't do it correctly. I am calling them. I can't again dispute that they have planting [sic] things, but I do not think it's for ag use. I do not think it's for business reasons . And that concludes my statement. (Emphasis added.)
¶ 18 It is clear the assessor equated "agricultural use" with growing crops for a business purpose .
*176 His testimony and closing remarks leave no doubt that his reclassification of the land from agricultural and agricultural forest to residential was driven by his erroneous understanding of the law, specifically his erroneous belief the Trust's land could not be classified as agricultural unless the crops were being grown for a business purpose.
¶ 19 During Board deliberations, Edward Kranick, one of the two Board members who voted against sustaining the assessor's reclassification of the property to residential, expressed that he had
[not] seen where it's necessary to really have a business in all of these exhibits and in the guide for the board of review. I have just seen that it's a use, that it has to be devoted primarily to agricultural use, and that it's being used in a way for agricultural use.... [W]hat I have learned this evening is that ... the accounting all needs to properly be that it's an ag use or being run as a farm and these schedules are being filed and the deductions are being taken . (Emphasis added.)
¶ 20 Following up, the chairman of the Board, Paul Kanter, who voted with Kranick against sustaining the residential reclassification, engaged in the following exchange with counsel for the Board:
[Kanter]: As to farming, you would agree that it's [sic] intent here is to protect a business concern, not horticulture as our ordinance defines horticulture ....
[Counsel]: There does need-Actually in the assessor's manual it makes [a] distinction between gardens and actual crop production. There does have to be some kind of a commercial interest in order for it to be separate from a personal garden where you're using it yourself. You need to have some interest in actually selling the product . (Emphasis added.)
*177 ¶ 21 Krause, again, one of the Board members who voted to sustain the assessor stated: "It states right here on the website, DOR website, provides that operations in, quotes, operations producing primarily for personal use, neighbors or family members with minimal sales are not considered a farming pursuit. Okay. That is what I heard here." Krause then expressed that Ogden's land "does meet the definition, very loose definition, of agricultural land ," but added:
*661 But you have to-I think you have to take it a step further . And also, our expert, we are bound to take the word of our assessor . He is the expert and according to law, we are bound to take that in absence anything [sic] else. He has the final word . His opinion counts.
....
Unless ... the evidence is preponderance on the other side....
But if we applied the loose definition of-the definition of agricultural land as [the Board chairman] was just saying, it would-it would apply to many properties . (Emphasis added.)
¶ 22 Cooley, again, the other board member who voted to sustain the assessor, commented that testimony Ogden presented about planting bluebird houses around the hay field, which Ogden acknowledged made his "yield" a little smaller, "really stuck out" because it "shrunk the size of their crop," which
seem[ed] to be counter productive of a business farm and more of a gentleman's farm. And I would say a gentleman's farm is more of a horticultur[al]ist than a farming operation. And the size of ... the ag forest lot is ... five-and-a-half and of that possibly one acre was *178 apples.... It seems the ratios again goes more to horticulturalist than farming operations. (Emphasis added.)
¶ 23 Kanter then expressed that the Ogdens had testified under oath
that their intent is a commercial farming operation.... And it only makes sense especially when you're dealing with an orchard or trees, that we can't judge their-the truthfulness of their under oath testimony on a handful of years. It's not corn or soybeans. And, so, it's going to take years for trees to grow and for fruit trees to bear fruit and for Christmas trees to be tall enough to be sold commercially. And what we are left with is they are under oath representations, statement to this board ... that this is what their intent is.
Kanter concluded that the Ogdens had "made [their] case." Kanter and Kranick voted against sustaining the assessor's residential reclassification and in favor of continuing the agricultural and agricultural forest classifications, while Cooley and Krause voted to sustain the assessor's reclassification and the related assessment. Because of the tie vote, the assessor's decision, which began with a legal presumption of correctness, see Anic , 311 Wis. 2d 701, ¶ 10, 751 N.W.2d 870, was sustained.
¶ 24 The change in classification of the property from agricultural and agricultural forest to residential was based on the assessor's incorrect understanding that in order for property to qualify as agricultural land, crops thereon must be grown for a business purpose. The Board then erred in sustaining the change based upon its similar misunderstanding of the law. According to the plain language of WIS. STAT. § 70.32(2)(c)1i., WIS. ADMIN. CODE § TAX 18.05(1) (June 2015), and subsector 111 Crop Production, it is the *179 "growing" of qualifying crops that constitutes agricultural use, whether they are grown for a commercial purpose or not.
¶ 25 The Board invites us to evaluate the evidence ourselves and determine based on photographs in the record that the land was not "devoted primarily to the agricultural use." In light of the abundance of testimony that apple trees, pine trees intended to serve as Christmas trees, and hay in fact were planted and growing on the property, it would be error for us to make the determination the Board seeks. Ogden asks us to remand "with instructions that the circuit court order the Board to overturn the Assessor's assessment." Because the assessor's determination of *662 the appropriate classification was driven by his erroneous understanding of the law, the more appropriate action is for the circuit court to remand this matter to the Board to assess the Trust property anew in a manner that is not inconsistent with this decision.[3] See Fee , 259 Wis. 2d 868, ¶ 18, 657 N.W.2d 112 (remanding matter because the assessor "acted contrary to law by failing to consider the effect" of a conservation land contract on the value of the land, and the board of review "erred when it affirmed the valuation").
By the Court. -Order reversed and cause remanded with directions.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

While such a representation was, as we explain, in error, the Board makes no contention that the Trust is legally estopped from asserting that the Board failed to act according to law due to Ogden reading this memo to the Board.

The parties agree that if the relevant portion of the property is classified as agricultural, then the wooded portion would necessarily be classified as agricultural forest, but if the relevant portion is classified as residential, then the wooded portion would not be classified as agricultural forest. See Wis. Stat. § 70.32(2)(c) 1d.a. Thus, we need not further address the agricultural forest issue here.